UNITED STATES of America, Plaintiff,

v.

Jerome BOUCHARD, Defendant.

UNITED STATES of America, Plaintiff,

v.

BEN RUBY AND SONS, B. I. Bliss, Brownton State Bank of Minnesota, Brownton, Wisconsin, Chippewa Farm Land Company, Edward J. Conroy, J. S. Crisler, S. B. Davis, Dells Lumber and Shingle Company, Frank A. Froemel, Helen Froemel, Jessie M. Froemel, Judy M. Froemel, Louis Froemel, Mary Froemel, Roger M. Froemel, Vincent Froemel, Roy G. Frogness d/b/a Frog Holl Wood Products, Division of F.V.E., Inc., Harvey D. Gardner, Helene Gatch, Waldo E. Gieseker, Town of Radisson, a Political Body, State of Wisconsin, a Sovereign State, J. A. Pugh, Eyvind C. Quist, Harriette D. Quist, Jump River Electric Cooperative, Inc., Town of Radisson, Trustee for the Radisson and Couderay Boy Scouts of America, Troop 55, Chippewa Council, W. A. Rust, Emma Satek a/k/a Emma L. Satek, William J. Satek a/k/a William Satek, Sawyer County, Wisconsin, Joseph L. Scala, John Schwarz, Arthur E. Soderquist, Douglas Soderquist, Edith Soderquist, Patricia A. Soderquist, State Bank of LaValle, Richard J. Sunderland, Veda H. Sunderland, Stephen J. Szorc, Susie Szorc, Town of Sand Lake, a Political Body, Town of Bass Lake, a Political Body, Roy Grass, Sharon L. Grass, A. H. Hanson, F. G. Hoag a/k/a F. G. Haag, Marth Wade Hopkins a/k/a Martha Ware Hopkin, Interstate Investment Company, John Arpin Lumber Company, Ranson Jones a/k/a Ransom Jones, Kate Townsend Joss, M. H. Bekkedal & Sons, Inc., Jane Prescott Marstow, Thomas E. McDermott, Alexander A. McDonald a/k/a A. A. McDonald, Theresa McVay, John E. Moreland, Josephone Nelson, Anthony S. Nesser, Jr., Anthony S. Nesser, Sr., a/k/a Anthony Nesser, June K. Nesser, Northern Lakes Credit Union, C. M. Olson, Elisa Moan Olson, Owens Illinois Glass Company, Park Falls Lumber Company a/k/a Edward Hines Lumber Company, Tom O. Mason Company, Joseph R. Trepania, Mattie Waters, Lorraine M. Westphal, William Westphal, General Telephone Company of Wisconsin, Defendants.

LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, and Frederick Tribble and Michael Tribble, Individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Lester P. VOIGT, Individually and as Secretary of the Department of Natural Resources, State of Wisconsin, Norman L. Yackel, Individually, as District Attorney for Sawyer County, Wisconsin, and as a representative of the group of all District Attorneys and Assistant District Attorneys in the ceded territory, Larry Miller and Milton Dieckman, Individually, as Conservation Wardens for the Department of Natural Resources, State of Wisconsin, and as representatives of the group of all conservation wardens in the ceded territory, Donald Primley, Individually, as Sheriff for Sawyer County, Wisconsin, and as a representative of the group of all ex officio Conservation Wardens in the ceded territory, their agents, assistants, successors, employees, attorneys and all those acting in consort with them or at their direction, Defendants.

Nos. 76–CR–70, 72–C–366, 74–C–313.

United States District Court,
W. D. Wisconsin.

Sept. 20, 1978.

all involve interpretation of treaties between the Chippewa and the United States in 1837, 1842 and 1854, as well as an executive order issued in 1850.

*United States v. Bouchard* is a criminal proceeding brought pursuant to 18 U.S.C. § 1165. The United States charges that defendant trespassed upon a waterway belonging to the Bad River Tribe and held in trust by the United States, for the purpose of fishing. Defendant contends that the waterway does not belong to the Indians or the United States, but became the property of the State of Wisconsin upon its admission to the Union in 1848. Plaintiff argues that the rights granted to the Chippewa in the 1842 treaty prevented the State's acquisition of title to the waterway; alternatively, that the 1854 treaty validly granted the Bad River Tribe exclusive use of the waterway at issue.

*United States v. Ben Ruby and Sons, et al.* is a civil action brought by the United States for a declaratory judgment that it holds title in fee to three sections of land for the benefit of the Lac Courte Oreilles Band, and that none of the defendants enjoys any interest in these sections. Each section is a section 16. The 1846 Act of Congress enabling Wisconsin to achieve statehood granted to the prospective State for school purposes every section 16 "not otherwise disposed of." The United States argues that at the time the State's title might have vested pursuant to the 1846 Act, the sections 16 at issue had been "otherwise disposed of" by virtue of the Indians' right to occupy those lands pursuant to the treaties of 1837 and 1842. The State and the other defendants, whose claimed interests depend upon State grants, argue that the Indians' right to occupy the lands was terminated by a Presidential order in 1850, allowing the lands to pass to the State. The effect of executive action in 1873 finally defining the boundaries of the Lac Courte Oreilles reservation is also in dispute.

In *Lac Courte Oreilles Band of Lake Superior Chippewa Indians, et al. v. Voigt, et*

Steven E. Carroll, Lands and Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff United States.

David M. Weiby, Superior, Wis., for defendant Jerome Bouchard.

Robert B. McConnell, Asst. Atty. Gen., State of Wis., Madison, Wis., for defendants State of Wisconsin and Lester Voigt.

M. Scott Cisney and R. E. Sommer, Korth, Rodd, Sommer & Mouw, S. C., Rhinelander, Wis., for defendant Owens Illinois Glass Co.

Peter J. Sferrazza and John M. Wiley, Wisconsin Judicare, Inc., Wausau, Wis., for plaintiff Lac Courte Oreilles Band of Lake Superior Chippewa Indians.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

These three cases all require a determination of the property interests and hunting and fishing rights of the Chippewa Indians in northern Wisconsin. In varying degree,

*al.,* the Indians seek a declaratory judgment that they have the right, pursuant to the treaties of 1837 and 1842, to hunt and fish on non-reservation lands in northern Wisconsin free from State regulation. Defendants argue that any such right was extinguished by the executive order in 1850, or by the 1854 treaty.

■ A treaty between the United States and an Indian tribe must "be construed as the Indians would have understood it . . . as disclosed by the practices and customs of the Indians at the time the treaty was negotiated . . . and by the history of the treaty, the negotiations that preceded it, and the practical construction given the treaty by the parties . . . ." *United States v. Top Sky,* 547 F.2d 486 at 487 (9th Cir. 1976). Accordingly, in an effort to construe the treaties at issue in the appropriate context, I have made extensive findings of fact, as hereinafter set forth under the heading "Facts." Not all of these findings are relevant to all three cases to which this consolidated opinion is addressed, but each finding is considered relevant to one or more of the three cases.

### Facts

The Chippewa Indians settled in what is now northern Wisconsin and Minnesota during the latter part of the seventeenth century. They lived in small bands throughout the territory, and made their living by hunting, fishing, and harvesting wild rice and maple sap. The Lake Superior Tribe lived in the northern part of their territory along the Lake Superior shore; the Mississippi Tribe lived farther south. The Chippewa's land became a part of the United States with the establishment of the Northwest Territory in 1787. Significant numbers of white people began to settle in the territory, and Wisconsin was established as a separate territory in 1836.

During approximately the first half of the nineteenth century, the federal government's Indian policy was to buy Indian lands where white settlement was advancing, and to remove the Indians to places farther west. Pursuant to that policy, Wisconsin Territorial Governor Henry Dodge was authorized in 1837 to negotiate a treaty with the Chippewa Indians for the purchase of some of their Wisconsin lands. The appropriations act for the Indian Department, dated March 3, 1837, included $10,000 for "holding treaties with the various tribes of Indians east of the Mississippi River, for the cession of lands held by them . . . and for their removal west of the Mississippi. . . ." On May 13, 1837, the Office of Indian Affairs wrote to Treaty Commissioner Dodge about the government's purposes in negotiating a treaty. The letter noted that the land was valuable for its pine timber and that a treaty would open the territory for white settlement.

The notes of Verplanck Van Antwerp, secretary of the treaty council, indicate that when all of the expected Indian chiefs had arrived at the council grounds in July, 1837, Commissioner Dodge told them that the government wished to buy a portion of their lands, and showed them a map of the desired land. He explained the map thoroughly, and told the Chiefs that the area was barren of game and not good for agriculture, but it "abounded in pine timber, for which their Great Father the President of the United States wished to buy it from them, for the use of his white children. . . ."

The next day, the Indians replied through their spokesman Ma-ghe-ga-bo. He told Commissioner Dodge the Chiefs wanted to reserve the streams in the area and the maple trees to collect sap, as well as the right to hunt in the lands. He stated that the Indians would like annuities in money and goods for sixty years, saying that at the end of that time, their grandchildren could negotiate for themselves. He also asked for provisions for the half-breeds and traders. He pointed out 19 Indian villages within the desired land. Finally, all of the chiefs who agreed to selling the land arose, and Ma-ghe-ga-bo said that the Indians agreed to grant the government the land. Commissioner Dodge responded, saying that

the "Great Father" never buys land for a term of years, but that he would agree on behalf of the President to grant the Indians the "free use of the rivers, and the privilege of hunting upon the lands you are to sell to the United States during his pleasure. If you sell these lands, you must sell them as all the other nations of Indians have done. . . ."

On the next day, Aish-ke-bo-gi-ko-she spoke on behalf of the Chiefs, saying:

> Your children are willing to let you have their lands, but they wish to reserve the privilege of making sugar from the trees, and getting their living from the Lakes and Rivers, as they have done heretofore, and of remaining in [the] country. It is hard to give up the lands. They will remain, and can not be destroyed—but you may cut down the trees, and others will grow up. You know we can not live, deprived of our Lakes and Rivers; There is some game on the lands yet; and for that reason also, we wish to remain upon them, to get a living. Sometimes we scrape of the trees and eat of the bark. The Great Spirit above, made the Earth, and causes it to produce, which enables us to live.

Commissioner Dodge replied in part: "I will make known to your Great Father, your request to be permitted to make sugar, on the lands; and you will be allowed, during his pleasure, to hunt and fish on them. It will probably be many years before your Great Father will want all these lands for the use of his White Children." The treaty proceedings concluded with discussions about annuities and provisions for half-breeds and traders; then Commissioner Dodge had the treaty read to the Indians,

and it was signed. Among the Indians signing the 1837 Treaty of St. Peter's were Chiefs from LaPointe and "Lake Courteoville."

The accounts of what was said, of course, are only of what was understood by the white men. Van Antwerp commented after one particularly clumsy passage in his notes: "This of course is nonsense—but is given literally as rendered by the Intrepeters [sic] who are unfit to act in that capacity. I presume it to mean. . . ." [1]

The Treaty of 1837 states in Article 1 that the Chippewa nation of Indians "cede to the United States all that tract of country" described in the article.[2] The United States agreed to pay annuities in the form of goods and money, to distribute money to half-breeds, and to pay some Indian debts to traders. Article 5 states: "The privilege of hunting, fishing and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied [sic] to the Indians, during the pleasure of the President of the United States." [3]

The present Lac Courte Oreilles reservation is within the territory ceded by the 1837 treaty.

On March 3, 1841, Congress appropriated $5,000 for the expenses of negotiating a treaty to extinguish Indian title to lands in Michigan. At least some of the Indian title to Michigan lands was held by Chippewa bands.

In a letter dated July 27, 1842, Robert Stuart, Superintendent of the Michigan Indian Agency wrote to the Secretary of War that since the March, 1841 appropriation it had been learned that the mineral district

1. Benjamin Armstrong, a trader who lived in Chippewa territory, reported in a book about his experiences with the Indians that the commissioners of the 1837 treaty told the Indians that the "great father" had sent them to buy their pine timber and minerals, not their lands, because it was too cold in the country for farming. Armstrong, however, stated that the Commissioners were Col. Snelling and Maj. Walker, which is contradicted by the evidence. It also seems, in speaking of the desire for mineral lands, that he may have confused in his memory the 1837 and 1842 treaties. Thus I cannot give much weight to his account of the 1837 treaty negotiations. See B. G. Armstrong, *Early Life Among the Indians* 10–12 (1892, Ashland, Wis.).

2. See Appendix A for maps showing the territory ceded.

3. The treaty is set forth in full at Appendix B. *See also* 7 U.S. Statutes at Large (Indian Treaties) 536.

Congress wished to acquire extended beyond northern Michigan into Wisconsin. He recommended purchase of the Indian territory in northern Wisconsin, as well as Michigan, pointing out that "the main importance of immediately acquiring this territory, is owing to its supposed great mineral productivity. . . ." Stuart also noted that it would not be necessary to remove the Indians in the ceded area until the land was required for white settlement.

On August 1, 1842, Stuart was appointed commissioner to negotiate the treaty with the Chippewa. His instructions from the Office of Indian Affairs stated that he could negotiate for cession of lands west of Michigan, and stressed the importance of gaining the mineral lands as well as the importance to commerce of controlling the south shore of Lake Superior. Although Indians might have to remove from specific mineral lands immediately, the instructions said, general removal from the territory would not take place for a "considerable time."

In his annual report to the Bureau of Indian Affairs dated October 28, 1842, Stuart reported that he had met with the Chippewa at LaPointe and concluded a treaty whereby the Chippewa agreed to sell all of their lands between Lake Superior and the Mississippi. He reported that the mineral district was "extensive and valuable" and that the fisheries along the shore and islands of Lake Superior were plentiful "and must at no distant period become a considerable source of revenue to our citizens. . . ." He also reported that the Lake Superior tribe had feuded with the Mississippi tribe about annuities under the 1837 treaty; therefore the new treaty arranged for a sharing of annuities under both treaties.

In the 1842 treaty, the Chippewa of the Mississippi and Lake Superior ceded to the United States all the country described in the treaty, north of the 1837 cession.[4] Article II states:

> The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.

Articles III and IV pertain to annuities, provisions for half-breeds, and the lands to which the Indians would remove. Article V points out that the land ceded by the 1837 treaty and the 1842 treaty have been understood as belonging in common to both the Lake Superior and Mississippi Chippewa and that the Lake Superior Chippewa had been denied participation in the 1837 treaty annuities. It provides that each tribe will share equally in the annuities under both treaties. Article VI states: "The Indians residing on the Mineral district, shall be subject to removal therefrom at the pleasure of the President of the United States."

The present Bad River reservation is within the territory ceded by the 1842 treaty.

The December 5, 1842, report on the treaty by the Commissioner of Indian Affairs to the Secretary of War stated that the treaty resulted in acquisition of land, minerals, and command of the south shore of Lake Superior. The report of the Superintendent of the Wisconsin Indians to the Commissioner of Indian Affairs in November, 1843, pointed out that exclusive possession of the Lake Superior shore was commercially important and would be more so as settlements and mineral trade expanded.

White settlers began moving into the ceded territory very soon after the treaty was signed. In a letter dated August 1, 1843, the LaPointe sub-agent for Indian Affairs reported to the Wisconsin Territorial Governor that whites had settled on principal rivers and thoroughfares, and were selling whiskey to the Indians. A report to the Secretary of War on November 1, 1843, showed that licenses had been issued for mineral exploration in the ceded area. Copper mining along the southern shore of

---

4. Maps showing the territory ceded are at Appendix A; the full text of the treaty is at Appendix B. *See also* 7 U.S. Statutes at Large (Indian Treaties) 591.

Lake Superior boomed in the 1840's and 1850's.

On August 6, 1846, Congress enacted a law to enable Wisconsin to form a constitution and establish a state government. The act provides in Section 3 that the navigable waters of the state would be "common highways, and forever free," and that the state would be admitted to the Union "on an equal footing with the original States in all respects whatsoever." Section 7, Part 1 provides that within the public lands lying within the boundaries of the prospective state, section 16 in every township would be granted to the State for the use of schools, except "where such section has been sold or otherwise disposed of." No part of the sections 16 in Township 39 North, Range 7 West, Township 39 North, Range 8 West, and Township 40 North, Range 8 West, all in the Fourth Principal Meridian, Sawyer County, Wisconsin, had been sold by the United States to anyone at any time through March 1, 1873. They were public lands.

Wisconsin was admitted to statehood by Act of Congress in 1848.

At least as early as 1846, the Commissioner of Indian Affairs began suggesting in his annual reports that the Chippewa be removed to the land set apart for them west of the Mississippi. In a report dated November 30, 1846, the Commissioner promoted removal, saying that in their then widely dispersed state, little could be done to give the Chippewa "the benefit of the benevolent policy of the government for the improvement of the Indian race." A change in the disposition of the tribe, and its members' intellectual, moral and social development could only be brought about, he wrote, by concentrating them "within fixed and reasonable limits," where "game will soon become scarce, and they will be compelled gradually to resort to agriculture and other pursuits of civilized life. . . . " Similarly, the Superintendent of Indian Affairs for the Territory of Wisconsin wrote in 1846 that the Chippewa's "condition as a people" would be improved by removal. And the LaPointe sub-agent reported in 1846 that removal would be a step toward the improvement of the Chippewa. He also reported that numerous whites had settled on the lower Mississippi and were selling whiskey to Indians in that area, causing "depredations upon the property of the settlers, and difficulties between individuals, whites and Indians."

The Commissioner of Indian Affairs took steps during the summer of 1847 to achieve his goal of removal. Two government agents were dispatched to seek Chippewa agreement to a plan of resettlement, but those efforts were unsuccessful.

On November 30, 1847, the Commissioner of Indian Affairs wrote in his annual report: It would be far better for [the Chippewa] if they were all concentrated in their country west, where they could be almost effectually protected from the pernicious influences now operating to bring down upon them misery and degradation." The 1847 report if the LaPointe sub-agent records two incidents of violence between the Chippewa and white settlers. In one, the Indian was acquitted of murder on the ground of self defense; in the other, the agent investigated and concluded that the whites were at fault. He concluded generally:

I fear, that in our accounts of outrages and crime, we have done the Chippewas, if no other tribe, injustice in many cases; for I find on comparing them with almost any civilized community of the same size, for four years, there will be found the smaller aggregate of crime on the part of the savage; and every crime of any magnitude which has been committed may be traced to the influence of the white man.

In the 1848 annual report of the Commissioner of Indian Affairs, he reported generally on progress toward the Bureau's goal of moving the Indian population to lands west of the Mississippi River. He noted that most Wisconsin Indians had been removed, leaving only the Chippewa who "are remaining by sufferance on lands which, looking only to their own benefit, they should soon be required to remove." While he does not explain the basis of that recommendation, much of his report deals with the advantages of confining Indian tribes to

smaller grounds than they had previously roamed, forcing them to turn to agriculture for subsistence and making it easier for government officials to "civilize" them. He also pointed out that such a policy promotes efficiency, requiring few agents to supervise more concentrated groups of Indians. The LaPointe sub-agent's 1848 report mentions no conflicts between Indians and whites.

In 1849, the Commissioner of Indian Affairs again recommended removal, as well as purchase of the remaining Chippewa lands east of the Mississippi River. The two reasons given were "for tranquility of citizens who suffer annoyance and loss from depredations" and for the "permanent welfare" of the Indians "where, confined within narrow limits, they will be compelled as the game becomes scarce, to give up the chase, and their wild and unsettled mode of life, and to resort to agriculture and other civilized pursuits. In such a situation, too, the Government . . . would have a better opportunity effectively to bring to bear upon them its policy and measures for the civilization of our Indian tribes. . . ." A third reason for removal is suggested by the Commissioner's comment that removal and purchase of the lands east of the Mississippi would effectively accomplish "the great policy of transplanting the Indian tribes from the midst of our white population and within state limits . . . to new countries specifically set apart for them."

The report of the LaPointe sub-agent to the Commissioner of Indian Affairs in 1849 notes some "disturbances and outrages" between Indians or between whites and Indians on the St. Croix and Chippewa rivers, and at Fond du Lac[5] and St. Croix Falls. He refers to a separate report on the disturbances, which I have not seen. The sub-agent expressed the opinion that sales of whiskey to the Indians by whites was the cause of most difficulty between the two

races, and acknowledges the possible validity of the Indian complaint that when Indians were guilty of acts against whites they were punished, while whites who committed crimes against Indians went free. He concluded that the "propriety of removing those bands . . . is becoming every year more and more manifest."

On February 7, 1849, a petition by the Lake Superior Chippewa was introduced in the United States Senate and House of Representatives. The Indians sought from Congress a "donation of 24 sections of land, covering the graves of our fathers, our sugar orchards, and our rice lakes and rivers, at seven different places now occupied by us at villages. . . ." The places listed included "LCotore" and "LaPoint." The petitioners stated that they sought the land for the purposes suggested, as well as for permanent cultivation and permanent homes, and expressed a fear of being driven north of the British line or west among wandering, "vicious" tribes.

On October 11, 1849, the Legislative Assembly of the Minnesota Territory passed a joint resolution requesting the President to remove the Chippewa to an unsettled area "to ensure the security and tranquility of the white settlements in an extensive and valuable district of this Territory."

The Commissioner of Indian Affairs and the Secretary of the Interior recommended a Presidential order of removal in 1850, without stating their reasons, and the President of the United States issued an executive order on February 6, 1850, revoking the privileges of occupancy granted to the Indians in the Treaties of 1837 and 1842, and ordering them to remove to Chippewa lands in Minnesota.[6] The order states:

> The privileges granted temporarily to the Chippewa Indians of the Mississippi, by the fifth article of the treaty made with them on the 29th of July 1837 "of hunting, fishing and gathering the wild rice

---

**5.** The reference to Fond du Lac is not to the site of the modern city of Fond du Lac, Wisconsin, but rather to a location on the shore of Lake Superior.

**6.** The October 21, 1850, report of the Minnesota Superintendent of Indian Affairs to the Commissioner of Indian Affairs contains an estimate that at that time about 5,000 Chippewa were parties to, and were receiving annuities under, the treaties of 1837 and 1842.

upon the lands, the rivers and the lakes included in the territory ceded" by that treaty to the United States, and the rights granted to the Chippewa Indians of the Mississippi and Lake Superior by the second article of the treaty with them of October 4th, 1842, of hunting on the territory which they ceded by that treaty, with the other usual privileges of occupancy until required to remove by the President of the United States, are hereby revoked and all of the said Indians remaining on the lands ceded as aforesaid, are required to remove to their unceded lands.

Armstrong reported the Indians' surprise in his book:

> No conversation that was held at this time [during the 1842 treaty negotiations] gave the Indians an inkling or caused them to mistrust that they were ceding away their lands, but supposed that they were simply selling the pine and minerals, as they had in the treaty, of 1837, and when they were told in 1849, to move on and thereby abandon their burying grounds—the dearest thing to an Indian known—they began to hold councils and to ask each as to how they had understood the treaties, and all understood them the same, that was: that they were never to be disturbed if they behaved themselves. Messengers were sent out to all the different bands in every part of their country to get the understandings of all the people, and to inquire if any depredations had been committed by any of their young men, or what could be the reason for this sudden order to move. This was kept up for a year, but no reason could be assigned by the Indians for the removal order.

*Early Life Among the Indians, supra* at 12.

Armstrong's report that the Indians learned of no depredations which could have been the reason for removal is confirmed by a letter from the Chippewa Indian Chiefs to the Commissioner of Indian Affairs on November 6, 1851, in which they stated in part:

> It is true, our Father that some of our countrymen have had trouble with the whites; but this is not true of us who live on the Lake. We have never shed the blood of the Whites, nor killed their cattle; nor done them injury; and we are not in their way. And why is [it] that we now hear this order to remove? We do not understand it.

On June 30, 1850, Chippewa Chief Hole-in-the-day wrote a letter to the white people which was published in a Minnesota paper. He said the Indians were told by the treaty commissioner in 1842 that they would not be removed for at least 20 years, and probably never. The commissioner had also said that the Great Father had no need of the land but wanted only the copper on it, the Chief continued. "It was on the strength of this promise, and nothing else, that our chiefs signed the treaty," he concluded. Similarly, in a letter to the Commissioner of Indian Affairs dated January 21, 1851, the Secretary of the American Board of Commissioners for Foreign Missions wrote that during the 1842 treaty negotiations:

> The Indians were told that they could remain where they were for an indefinite period, except so far as they might be required to give place to miners; and the Commissioner said to them. "You and I shall never see the day when your Great Father will ask you to remove." Had it not been for this assurance, it is presumed, the treaty would never have been consummated.

The Secretary added that he could foresee no danger of an "unpleasant collision" with white settlers if the Indians were allowed to remain. This version of the treaty is also corroborated by C. Mendenhall, a miner who wrote a letter to the Commissioner of Indian Affairs on January 6, 1851. He said that he was present at the 1842 treaty council, and that the treaty commissioner told the Indians there that they would be permitted to occupy their lands as long as they behaved well. The commissioner illustrated the point by saying, Mendenhall reported, "the purchase he wished to make was like buying a pack of furs of one of them, paying for it, then handing it back, for the Indians own use." Mendenhall add-

ed that he was aware of only one minor depredation of whites by Indians three years earlier when a group of Indians had killed a pair of oxen. He said the miners considered the Indians an advantage, not a nuisance.

W. W. Warren, a farmer who was employed by the government to teach farming to the Indians, wrote to Indian Superintendent Alexander Ramsey on January 21, 1851, saying he had recently visited a number of Indian villages and attended councils about the removal order with the chiefs. He reported great dissatisfaction with the removal order among the Chippewa. The Indians had understood the treaty commissioners to say that the government was interested only in copper, not their lands, and they they would not be removed during the term of their annuity, and probably never. "It was under this verbal understanding and only this, that the treaty was signed by the Chippeway [sic] Chiefs," he concluded.

Finally, Indian Agent Henry Gilbert wrote in his 1853 report to the Commissioner of Indian Affairs that the removal order had caused great fear and distrust among the Chippewa and was impeding efforts to help them. He explained:

The Indians informed me that when the [1842] treaty was made the Commissioner assured them that the clause providing for their removal was only inserted as a mere matter of form—that a compliance with it would never be urged or insisted upon by the Government and that their annuity would always be paid regularly at LaPointe. The Interpreter Mr. Johnson who officiated on that occasion was present with me and corroborated their statement. I saw several other persons who were present at that time and they all concur in saying that without that assurance the Indians would never have signed the Treaty. The memory of an Indian is very tenacious. He treasures up everything that is said by a Government officer and regards his statements and verbal assurances as equally binding upon the Government as the formal stipulation of a Treaty.

In an effort to achieve the removal to western lands, the place for payment of the Chippewa's annuities was changed from La-Pointe to Sandy Lake in the Minnesota Territory in late fall, 1850. The trip caused great hardship to the Indians; many died while waiting for the payments at Sandy Lake, or while returning to their homes afterward.

In a letter dated February 28, 1851, Indian Sub-agent Watrous wrote to Minnesota Territorial Governor Ramsey suggesting a plan of making annuity payments in early spring and late fall, in the hopes of inducing the Indians to stay at Sandy Lake rather than returning to their ceded lands in Wisconsin. Watrous was subsequently appointed superintendent of removal; Reverend William Boutwell was appointed assistant superintendent of removal.

On August 25, 1851, Indian Commissioner Lea of the Office of Indian Affairs sent a telegram to Superintendent Watrous, stating: "Suspend action with reference to the removal of Lake Superior Chippewas for further orders." On September 5, 1851, Commissioner Lea confirmed that the suspension had been ordered by the Secretary of the Interior until the President could decide whether the Indians would be permitted to remain on their lands, and that he had sent a telegram so informing Superintendent Watrous.

On September 18, 1851, Assistant Superintendent Boutwell wrote to Governor Ramsey, reporting on his efforts to gather the Chippewa at LaPointe and to begin their removal to Minnesota. He detailed a number of problems encountered, including Indian insistence that they had a right to remain on the ceded territory, but reported that a compromise was achieved whereby the annuity would be paid at Fond du Lac, that the Indians would be fed for one year and aided in building and establishing agriculture, and that the agent would recommend that a delegation of Chiefs be given permission to visit Washington, D. C. Boutwell noted that he had received a telegraphic dispatch on September 3 ordering him to suspend removal. However, he com-

ments: "The purport of this order remains a secret, and as the Indians are ready to go I shall start them."

Agent Watrous submitted his annual report, dated September 20, 1851, to Governor Ramsey, in which he stated that the removal commenced in May had met "many adverse interests, and counter currents to contend against," but that the entire removal had been accomplished with just the exception of a few small bands. He added that the muster rolls will show when completed that 3000 Chippewa had been removed, while 900 remained on the ceded lands. Finally, Watrous mentions:

Reasonable apprehensions may be entertained of those that have removed returning to their old homes, and that the citizens of Wisconsin and Michigan will again be annoyed by their depredations and plunder. To guard against this, a military post located at the head of Lake Superior, or a treaty (as before alluded to) is believed indispensable.

Superintendent Ramsey reported Watrous's observations to the Commissioner of Indian Affairs in an annual report dated November 27, 1851.

Chippewa Chief Buffalo wrote a letter to the Commissioner of Indian Affairs dated November 6, 1851, outlining the Indians' view of the 1850–51 removal efforts. He complained that the 1850 winter annuity payments at Sandy Lake were late and provisions were poor, causing hardship and death among the Indians both at Sandy Lake and on the difficult trip home. He also complained of a removal to Fond du Lac during the summer of 1851 where the Indians again found poor provisions, and returned again to their homes. He asked that all future payments be made at La-Pointe.

On December 15, 1851, Agent Watrous wrote to Superintendent Ramsey, saying "As active operations have now ceased in the removal of the Chippewas, I deem it proper to make a general statement, embodying the expense from the time the removal commenced, its results, and termination." He stated that the enrolling agent showed a roll of 1100 removed Indians and

that others were "daily coming in." He added that if the policy of paying annuities only to those who leave their lands were continued, he would predict that 1500 to 1600 more would remove of their own accord.

The Indians were greatly dissatisfied and disgusted with the provisions given them during the winter of 1851, however, and a group of Chiefs and braves left on April 5, 1852, with Benjamin Armstrong to go to Washington to see their "great Father." Chief Buffalo dictated a memorial to President Fillmore on June 12, 1852. In it, he again explained his understanding that the treaty annuities were always to be paid at LaPointe, and that "if we were good men, that we should not only be permitted to remain on our lands for fifty, but for one hundred years to come, and these were the words of your Commissioner." He further stated that the Chippewa had been peaceable to white men, and had not been in their way. He beseeched the President to order his agents to comply with the treaty of 1842, as the Indians understood it. Armstrong reported that the delegation did meet with the President and explained their grievances about the removal. He said that President Fillmore told the delegation that he would countermand the removal order and that payments would be made at La-Pointe as before. The President gave Chief Buffalo a written instrument explaining the promises he had made, and the delegation returned home. There is no current record of the President's contravention of the removal order that I am aware of. The Indians left Washington for their homes in late June, 1852.

Armstrong reported that the annuities for 1852 were paid at LaPointe, in mid-October. During that assembly for the payments, the President's letter was explained to the Indians and Chief Buffalo told them there was yet one more treaty to be made with the President, "and he hoped in making it they would be more careful and wise than they had heretofore been and reserve a part of their land for themselves and their children." *Early Life Among the Indians, supra* at 32.

In his October 26, 1852, report to the Commissioner of Indian Affairs, however, Superintendent Ramsey said that the Chippewa had been told that there would be no further payment of annuities upon ceded lands, and that a rigid adherence to paying annuities only to those who remove was the best way of accomplishing a removal which had met substantial resistance.

Armstrong reported that the 1853 and 1854 annuity payments were also made at LaPointe. The LaPointe location of the 1853 annuity payments is corroborated by the December 14, 1853, report of Indian Agent Henry Gilbert. Gilbert's report stated that he met with the Indians several times, learning that the "great terror of their lives" was the removal order, and that they would probably "sooner submit to extermination than comply with it." Gilbert also reported that the Indians and the whites in the area were living peacefully and harmoniously with one another.

In the annual report of the Office of Indian Affairs dated November 25, 1854, the Commissioner stated that a few small bands of Lake Superior Chippewas "still occupy their former locations on lands ceded by the treaties of 1837 and 1842. It has not, thus far, been found necessary or practicable to remove them." The Commissioner also stated that "it may be necessary to permit them all [the Chippewas] to remain, in order to acquire a cession of the large tract of country they still own east of the Mississippi, which, on account of its great mineral resources, it is an object of material importance to obtain. They would require but small reservations; and thus permanently settled, the efforts made for their improvement will be rendered more effectual."

The Commissioner's suggestion of establishing reservations for the Chippewa was consistent with a change in federal Indian policy in the 1850's, from one of removing Indians to western lands to one of setting aside small reservations for their permanent homes. Additionally, the reservation idea appeared to be acceptable to the white citizens of Wisconsin. On February 27, 1854, the Wisconsin legislature sent a memorial to the President and Congress, stating:

"MEMORIAL to the President and Congress of the United States, relative to the Chippewa Indians of Lake Superior.

"To His Excellency the President of the United States, and to the Senate and House of Representatives in Congress assembled:

"The Memorial of the Legislature of the State of Wisconsin respectfully represents:

"That the inhabitants of the counties of La Pointe and Douglass have nearly unanimously signed a petition showing to your memorialists, that the Chippewa Indians in the region of Lake Superior are a peaceable, quiet, and inoffensive people, rapidly improving in the arts and sciences; that they acquire their living by hunting, fishing, manufacturing maple sugar, and agricultural pursuits; that many of them have intermarried with the white inhabitants, and are becoming generally anxious to become educated and adopt the habits of the 'white man.'

"Your memorialists would therefore pray His Excellency, the President of the United States, to rescind the orders heretofore given for the removal of said Indians, and that such orders may be given in the premises, as shall secure the payment to said Indians, of their annuities at La Pointe, in La Pointe county on Lake Superior, that being the most feasible point therefor.

"And your memorialists also pray that the Senate and House of Representatives in Congress assembled will pass such laws as may be requisite to carry into effect such design and orders; and to encourage the permanent settlement of those Indians as shall adopt the habits of the citizens of the United States.

"And your memorialists firmly believing that justice and humanity require that such action should be had in the premises, will ever pray, etc.

"Approved, February 27, 1854."

In a letter dated August 11, 1854, the Indian Affairs Commissioner directed

Agent Gilbert to attempt to reach a treaty with the Chippewa to extinguish their title to lands in Minnesota and Wisconsin. The letter authorized Gilbert to reserve 748,000 acres for the permanent homes of the Indians in areas which did not include mineral lands and were out of the path of white settlement.

Armstrong wrote that when the Indians were notified that the government wished to make another treaty with them at the time of the 1854 annuity payments, the Indians met and discussed what they would require as the price of ceding their western lands to the government. They decided, Armstrong said, "that no one would sign a treaty that did not give them reservations at different points of the country that would suit their convenience, that should afterwards be considered their bona fide home."

Armstrong's statement is corroborated by the report of Commissioner Gilbert, dated October 17, 1854, in which he stated:

> We found that the points most strenuously insisted upon by them were first the privilege of remaining in the country where they reside and next the appropriation of land for their future homes. Without yielding these points it was idle for us to talk about a treaty. We therefore agreed to the selection of lands for them in territory heretofore ceded.

During the treaty negotiations, Armstrong reported that Chief Buffalo requested that Armstrong be the interpreter, expressing an opinion that interpreters at other treaty negotiations had made mistakes. Armstrong recorded Chief Buffalo saying, in part:

> We do not want to be deceived any more as we have in the past. We now understand that we are selling our lands as well as the timber and that the whole, with the exception of what we shall reserve, goes to the great father forever. *Early Life Among the Indians, supra* at 38.

The Treaty of LaPointe, concluded September 30, 1854, provided that the Chippe-

wa ceded to the United States described land west of Lake Superior. In Article 2, the United States agreed "to set apart and withhold from sale, for the use of the Chippewas of Lake Superior, the following described tracts of land . . . ." A specific area is then described by boundaries for the LaPointe, L'Anse and Viux De Sert Bands. The area reserved for the LaPointe band is the present Bad River reservation. For the other Wisconsin bands, a tract of land "lying about Lac De Flambeau" and a tract "on Lac Court Oreilles, each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President," were promised. Article 3 of the treaty reserved Presidential discretion to exchange the lands if the reservations were on mineral lands and to make changes in the boundaries of the tracts as "necessary to prevent interference with any vested rights." Other articles of the treaty set forth terms of annuity payments, provisions for half-breeds and traders, and a prohibition on spiritous liquors.[7]

On October 17, 1854, Agent Gilbert reported to the Indian Affairs Commissioner that he had concluded a treaty with the Chippewa at LaPointe on September 30. He reported:

> We found that the points most strenuously insisted upon by them were first the privilege of remaining in the country where they reside and next the appropriation of land for their future homes. Without yielding these points it was idle for us to talk about a treaty. We therefore agreed to the selection of lands for them in the territory ceded.

He described the Bad River reservation as the major Wisconsin reserve, saying it was on land "well adapted for agricultural purposes," except for about one-third of the area "lying on the Lake Shore [which] is swamp and valueless, except as it gives them access to the Lake for fishing purposes." He estimated the total reservation acreage under the treaty at 486,000 acres.

---

7. Maps showing the territory ceded are at Appendix A; the full text of the treaty is at Appendix B. *See also* 10 U.S. Statutes at Large 1109.

The valueless swampland Gilbert referred to is described differently by an historian who studied the 1854 treaty: "Known as the Kakagan Sloughs, it consisted of twelve square miles of wild rice fields alive with fish and nesting waterfowl." E. J. Danziger Jr. "They Would Not be Moved," *Minnesota History* 179 (Spring, 1973).

In a letter to the Office of Indian Affairs dated November 10, 1854, Gilbert attempted to estimate the area of the land ceded by the 1854 treaty. He described the western boundary as nearly a straight line about 155 miles in length, the northern boundary as about 135 miles long, and the eastern boundary as nearly connecting the northern and western boundaries, "thus giving us a tract of country nearly triangular." A small portion of the territory was not included in the triangle, he added, and he estimated the total area at 7,160,000 acres.

Armstrong reported in his book that Agent Gilbert discussed the 1854 treaty with the Indians again during the 1855 annuity payments assembly. At that time Gilbert assured them that no white man could live on the reservations or go upon them to take timber, minerals, or anything else, without the permission of the Indians.

Although the government continued to encourage the Indians to devote their efforts to agriculture, many continued to roam beyond reservation boundaries throughout the ceded area, hunting, fishing and gathering wild rice. The 1869 Report of the Commissioner of Indian Affairs noted that the Chippewa were living on their reservations only in the winter, and Danziger found that it was not until 1892 that the Commissioner of Indian Affairs could "state assuredly that a majority of the Chippewa of Lake Superior were permanent reservation residents." E. J. Danziger, supra at 182.

A survey of the land in the vicinity of Lac Courte Oreilles was made for the United States government in 1855, and accepted by the Surveyor General on February 20, 1856.

In 1859, a special agent was appointed by the Office of Indian Affairs to confer with the Lac Courte Oreilles chiefs to select a tract "equal in extent to three townships" guaranteed them by the 1854 treaty. The letter of instruction stated that the band would be found in the vicinity of the Menomonee and Red Cedar Rivers where they had sojourned from "the reservation provided for them at Lac Courte Oreille," and that the selection should be made from nine townships which had been reserved from sale and settlement for that purpose.

A list of selected lands prepared by the agent was transmitted from the Department of Interior to the General Land Office on October 20, 1859; and the Commissioner of the Land Office subsequently directed an Eau Claire Agency to enter the selections upon the land office books and plats. The selected lands included all of Townships 39 and 40, Range 8; Township 39, Range 7, except sections 22–27 and 34–36; sections 4–9 and 16–18 of Township 38, Range 8; and detached tracts in Township 40, Range 6 and 7.

In the document setting forth the selections, the Lac Courte Oreilles headmen agreed "to use all our authority and influence to induce our people to abandon the lands sold or ceded to the United States by us and our fathers, and to rest with us upon the lands selected by us and described within our reservation and homes."

That selection proved to be unsatisfactory, however, as indicated by a letter to the Secretary of the Interior on February 6, 1865. The writer, Indian Commissioner W. P. Dole, stated that it was difficult for the Indians to define the limits of their reservation because of a number of detached tracts of land. Dole recommended that lands adjacent to the compact portion of the reservation be withdrawn from sale in order to allow the Indians to select lands from that area in compensation for relinquishing the detached tracts of land. The order to withhold the lands from market followed on April 4, 1865.

Trouble with uncertain reservation boundaries continued in 1868. Indian Agent Asaph Whittlesey reported to the Commissioner of Indian Affairs that because of disagreements about the location

of boundary lines, the Chiefs of the Lac Courte Oreilles were involved in disputes about whether white men were trespassing on the reservation.

On December 18, 1872, Indian Agent Clark was instructed by the Commissioner of Indian Affairs to adjust the Lac Courte Oreilles reservation selections to make the reservation as compact as possible. He was specifically instructed "to omit Section 16 of each township from the original reserve as well as from the additional list of February 6, 1865. These sections are claimed by the State as school lands and it [is] thought best to avoid controversy in regard to them."

On February 17, 1873, Agent Clark presented the list of selected lands to the Acting Commissioner of Indian Affairs. The list was subsequently submitted by the Commissioner to the Secretary of the Interior, who approved it on March 1, 1873. The list indicates that a total of 69,136.41 acres were withdrawn for the reservation. It also indicates that no sections 16 were selected for the reservation.

There are 23,040 acres in a township; 69,120 acres in three townships.

On February 4, 1873, the Secretary of Interior wrote in a letter (addressee unknown) that he was of the opinion that sections 16 in the Lac Courte Oreilles reservation belonged to the State.

The Lac Courte Oreilles Tract Book kept at the Great Lakes Indian Agency has an "Allotment Roll" of land owned by individual members of the tribe. None of the lands listed there as belonging to individual tribe members is in a section 16. A number of maps of the reservation made by federal government agencies exclude sections 16 from the reservation lands.

The State of Wisconsin issued a patent to Section 16 in Township 39 North, Range 8 West to C. C. Putnam on June 7, 1875. On November 11, 1882, it issued a patent to C. C. Putnam for part of the lands in Section 16 in Township 39 North, Range 7 West. A patent to part of Section 16, Township 39 North, Range 7 West was issued by the state to A. B. McDonnell on August 24, 1883. George B. Burrows received a patent to part of Section 16 in Township 39 North, Range 7 West on January 23, 1885. A patent to part of Section 16, Township 39 North, Range 7 West was given on March 6, 1885, to a private person whose name I cannot read. Herman Greve received a patent to part of Section 16, Township 39 North, Range 7 West on December 11, 1884.

On June 21, 1937, the United States purchased land in Section 16, Township 40 North, Range 8 West from Johanna and Karl Treziok; the warranty deed was filed on June 28, 1937, in Sawyer County. On December 17, 1936, the United States purchased land from the Chippewa Valley Construction Co. Land in Section 16, Township 39 North, Range 7 West was included in the purchase. And on January 8, 1936, the United States bought land in Section 16, Township 40 North, Range 8 West from J. T. and Harriette Woon.

With respect to certain parts of Section 16 in Township 40 North, Range 8 West, and certain parts of Section 16 in Township 39 North, Range 7 West, the record does not disclose whether the state has issued patents or has retained its asserted title.

The Bad River and Lac Courte Oreilles Bands are part of the Lake Superior Tribe of Chippewa.

United States v. Bouchard, 76–CR–70

This is a criminal proceeding pursuant to 18 U.S.C. § 1165. In the amended information, the United States charges that defendant, without lawful authority and permission, willfully and knowingly went upon land known as the Kagagon Slough, a navigable waterway within the boundaries of the Bad River Indian Reservation, for the purpose of fishing, in violation of 18 U.S.C. § 1165. The amended information charges that by virtue of treaties between the United States and the Lake Superior Tribe of the Chippewa Indians signed in 1842 and 1854, the Kagagon Slough is land belonging to an Indian tribe, held in trust by the United States. Section 1165 states:

§ 1165. HUNTING, TRAPPING, OR FISHING ON INDIAN LAND

Whoever, without lawful authority or permission, willfully and knowingly goes

upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

Thus, the amended information rests upon that part of § 1165 which reads as follows: "Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any . . . Indian tribe . . . and . . . [is] held by the United States in trust . . ., for the purpose of . . . fishing thereon . . . ."

Defendant has moved to dismiss the amended information, citing four reasons: (1) water is not "land" within the meaning of the statute; (2) the slough does not belong to an Indian tribe and is not held in trust by the United States; (3) the Indians do not have an exclusive right to fish in the slough; and (4) § 1165 is unconstitutional and void because the right to regulate fishing is a power reserved to the state by the Tenth Amendment to the Constitution. Because I hold, below, that the amended information must be dismissed on the ground that the slough does not belong to an Indian tribe and is not held in trust by the United States, I will not consider contentions three and four.

Defendant's first contention is that the amended information alleges that defendant was in a boat on a waterway, and that a waterway is not "land" as defined in § 1165. Pointing out that penal statutes should be strictly construed, defendant urges "a common sense interpretation" of the word "land."

█ I conclude that when "land" is used in the context of § 1165, common sense indicates that it refers to broad areas of earth and water. Congressional intent re-

flected by the language of the Act is to prevent trespass upon Indian lands for the purposes of fishing, hunting or trapping. Fishing can only be done in water, of course; a person fishing from a boat is trespassing in the same sense as a person fishing from the shore.

This common sense interpretation of "land" is corroborated by the technical definition of land in *Black's Law Dictionary*, 1019 (4th Ed., 1951), which includes all things of a permanent and substantial nature such as water. *See also United States v. Pollman,* 364 F.Supp. 995 (D.Mont.1973), in which the court held that the term "land" in § 1165 clearly and unambiguously includes waterways.

The remainder of this opinion is directed to defendant's second contention, namely, that the bed of the navigable waterway upon which defendant was allegedly fishing became the State's property upon its admission to statehood in 1848 and remains the State's property today, and thus is not "land that belongs to any . . . Indian Tribe" and "held by the United States in trust."

The defendant contends that the treaty of 1842 resulted in the United States' ownership of the navigable waterway at issue; that the United States held that waterway in trust for the future State; that when the territory of Wisconsin became a State in 1848 title to the waterway became vested in the State as trustee for the public; and that any purported grant of navigable waterways to the Chippewa in 1854 by the United States was without authority and a nullity. Plaintiff responds with two contentions: first, that the Chippewa retained beneficial ownership of the land ceded to the United States by the treaty of 1842 and thus the State did not take title to the waterway at issue upon statehood; second, that even if the State did acquire title to the waterway at issue, the United States had sufficient treaty authority to grant exclusive use of the waterway to the Chippewa in 1854.

Wisconsin entered the Union "on an equal footing with the original States," and

the original States possessed ". . . the absolute right to all their navigable waters and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government." *Martin v. Waddell,* 41 U.S. (16 Ped.) 366, at 410, 10 L.Ed. 997 (1842).

■ Assuming that the Chippewa ceded all their rights in the navigable waterways within the boundaries of the ceded area to the United States by the 1842 treaty, it is well settled that the government's title to the beds of navigable waterways was held in trust for the future State, and upon statehood passed to Wisconsin in trust for the public. *Borax, Ltd. v. Los Angeles,* 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935); *Donnelly v. United States,* 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913); *Shively v. Bowlby,* 152 U.S. 1 at 49, 14 S.Ct. 548, 38 L.Ed. 331 (1894).

This principle was explained in *United States v. Holt State Bank,* 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926). The United States had brought suit to clear title to the bed of a lake which had been a navigable body of water in an Indian reservation. After the reservation was terminated and the lands around the lake sold to various settlers, the lake was drained. The issue was whether the bed of the lake belonged to the state or the federal government. The court held (270 U.S. at 54–55, 46 S.Ct. at 198–199):

> It is settled law in this country that lands underlying navigable waters within a state belong to the state in its sovereign capacity . . . subject to the qualification that where the United States, after acquiring a territory and before the creation of the state, has granted rights in such lands . . . such rights are not cut off by the subsequent creation of the state, but remain unimpaired, and the rights which otherwise would pass to the state in virtue of its admission into the Union are restricted or qualified accordingly. . . .

> The state of Minnesota was admitted to the Union in 1858 . . . and under the constitutional principle of equality among the several states, the title to

the bed of Mud Lake then passed to the state, if the lake was navigable, and if the bed had not already been disposed of by the United States.

■ The "disposal" of a navigable waterway which prevents a state from obtaining fee simple title to the water and the land beneath it may either be a transfer of legal ownership, such as the fee simple title given to the Indians in *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), or a transfer of beneficial ownership. In *United States v. Finch,* 548 F.2d 822, at 827 (9th Cir. 1976), for example, the court held:

> The United States either transferred beneficial ownership of the bed to the Crow Tribe by the treaties of 1851 and 1868 or retained ownership of the bed as public lands, which passed to the State of Montana upon its admission to the Union.

■ To determine whether beneficial ownership of the lands has been transferred, the *Finch* court examined the treaties to determine whether they had reserved the riverbed for the exclusive use of the tribe. A similar inquiry into the exclusivity of the Indians' use was made in *Montana Power Co. v. Rochester,* 127 F.2d 189 (9th Cir. 1942), and *United States v. Pollman,* 364 F.Supp. 995 (D.Mont.1973). The propriety of this inquiry is indicated by the Supreme Court's analysis of the relevant treaty in *Holt, supra.* In determining that the treaty did not constitute a disposal of the waterbed to the Indians, the court placed considerable reliance upon the fact that there was no attempted exclusion of non-Indians from the navigable waters, but that the Indians' right was held only in common with the right of white settlers to use the waters. Additionally, an inquiry into exclusivity of use is consistent with the general principle that the federal government cannot hold the same property simultaneously in trust for two conflicting purposes. *See also Bennett County, South Dakota v. United States,* 394 F.2d 8 (8th Cir. 1968), in which land set aside for exclusive use of the Indian tribe was held not to be "public land" upon which the state could build a highway.

Accordingly, I must examine the 1842 treaty to determine whether the Chippewa reserved for themselves exclusive use of the navigable waterways in the ceded area.

There is no specific statement in the 1842 treaty about the Indians' rights in or to the navigable waterways which were within the boundaries of the subject area of the treaty. Based upon language in *Holt State Bank*, defendant argues that in the absence of a clear indication that the title to the waters was placed in the Indians, such an inference should not be made. In *Holt*, the court stated that "disposals [of navigable waters] by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." 270 U.S. at 55, 46 S.Ct. at 199.

However, the *Holt* standard is drawn from *Shively, supra*, a case involving a grant of property rights to a private person, and the standard is incompatible with long established and well recognized rules of construction for Indian treaties. In *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), a rule of liberal construction in favor of the Indians was established with this comment (31 U.S. at 582):

> The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense. . . . How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.

And in *Choctaw Nation v. United States*, 119 U.S. 1, at 28, 7 S.Ct. 75, 90, 30 L.Ed. 306 (1886), the court said:

The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection. The parties are not on an equal footing, and that inequality is to be made good by the superior justice which looks only to the substance of the right, without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons, equally subject to the same laws.

That standard has been applied consistently in construing Indian treaties,[8] and has recently been reiterated in *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970). *Choctaw Nation* also involved the federal government's disposition of title to riverbeds of navigable waterways in a territory of the United States. The Court held (397 U.S. at 630–631, 90 S.Ct. at 1334):

> . . . these treaties are not to be considered as exercises in ordinary conveyancing. The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them [citations omitted], and any doubtful expressions in them should be resolved in the

8. See *DeCoteau v. District County Court for Tenth Judicial Dist.*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Squire v. Capoeman*, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956); *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); *United States v. Pollmann*, 364 F.Supp. 995 (D.Mont.1973); *State v. Gurnoe*, 53 Wis.2d 390, 192 N.W.2d 892 (1971).

Indians' favor . . . [citations omitted].

Specifically addressing the argument that a grant of the riverbeds could not be inferred because the treaty "did not pause specifically to provide for the ownership of the riverbed," the court minimized the import of the treaty construction rule suggested by the court in *Holt* (397 U.S. at 634, 90 S.Ct. at 1336):

> However, nothing in the *Holt State Bank* case or in the policy underlying its rule of construction (see *Shivley v. Bowlby, supra* [152 U.S.] at 49–50 [14 S.Ct. 548]) requires that courts blind themselves to the circumstances of the grant in determining the intent of the grantor. Indeed, the court in *Holt State Bank* itself examined the circumstances in detail and concluded "the reservation was not intended to effect such a disposal." 270 U.S. at 58, [46 S.Ct. 197]. We think that the similar conclusion of the Court of Appeals in this case was in error, given the circumstances of the treaty grants and the countervailing rule of construction that well-founded doubt should be resolved in [the Indians'] favor.

In the present case, there is some evidence indicating that the Indians did not understand they were ceding their land by the 1842 treaty. Armstrong reported that the Indians thought they were selling only the pine timber and minerals, and Chief Hole-in-the-day wrote that he understood the whites wanted only the copper in the land.

Yet the language of cession is clear and unqualified. Even construing that language liberally in favor of the Indians, I cannot construe it as not meaning what it clearly says. See *DeCoteau v. District County Court for the Tenth Judicial District*, 420 U.S. 425 at 447, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). Additionally, although the Indians probably did not understand the concept of legal title, the evidence shows that they did know they were giving up significant rights in the land. They knew that their occupation of certain parts of the territory would be ended to make way for mining and logging operations, that they would have to accommodate white settlers, and that they could be removed completely if they misbehaved. Additionally, the language of the Chippewa's 1849 petition to Congress asking for a "grant" of lands for Indian villages shows their understanding that they did not have a legal right to those lands. Thus, I find that the Chippewa did convey to the United States their so-called "aboriginal title," discussed below, to the lands described in the 1842 treaty.

The more difficult issue is whether the Indians' stipulation "for the right[s] of hunting . . . with the other usual privileges of occupancy" was intended as a reservation of exclusive hunting and fishing rights in the ceded lands.

All of the cases of which I am aware in which Indians were found to have been given an exclusive right to hunt or fish in certain areas involved treaties establishing reservations for the Indians' permanent homes. In some cases, exclusive use or affirmative exclusion of "unauthorized persons" was explicit. *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *United States v. Finch*, 548 F.2d 822 (9th Cir. 1976); *United States v. Pollmann*, 364 F.Supp. 995 (D.Mont.1973); *Moore v. United States*, 62 F.Supp. 660 (W.D.Wash.1945). aff'd 157 F.2d 760, *cert. denied* 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277. In *Choctaw Nation, supra*, the reservation lands were given in fee simple. In other cases, the courts noted that the Indians were being confined to reservation lands as their permanent homes; that the reservation lands were only a portion of the Indians' previous holdings; and that if the Indians were to be able to support themselves by their traditional means of sustenance without depleting their food supply, they would need exclusive rights to hunt and fish on the reservation lands. *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *United States v. White*, 508 F.2d 453 (8th Cir. 1974); see also *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968).

In the present case, the Indians were not confined by the terms of the 1842 trea-

ty to an area smaller than the one they occupied at the time of the treaty; they reasonably would have expected that the miners, loggers and soldiers who were settling in the territory would hunt and fish for their food; and with the abundance of fish and game in northern Wisconsin, it is unlikely that either the Indians or the government would have anticipated that it would be necessary for the Indians to have exclusive fishing and hunting rights in order to maintain themselves in their vast territory. I conclude that the right of hunting and "other usual privileges of occupancy" which the Indians reserved in the treaty of 1842 were rights held in common with white persons in the area. Thus, the bed and waters of the Kagagon Slough were not reserved exclusively for the Chippewa by the 1842 treaty, and title to the bed of that navigable waterway passed to Wisconsin upon admission as a state in 1848.

 Defendant argues further that since the State of Wisconsin acquired title to the Kagagon Slough in 1848, any purported grant of rights in that waterway to the Chippewa by the 1854 treaty was "subject to the prior and paramount rights of ownership and/or the power to regulate the

navigable waters which the State of Wisconsin acquired. . . ." Plaintiff responds that the federal government had the treaty power in 1854 to grant the Chippewa the right to exclusive use of the navigable waterways in their reservation. While it is likely that the federal government did have the treaty authority to grant the Chippewa exclusive use of the waterways,[9] it appears that the particular language of § 1165 upon which the amended information rests requires that title to the land upon which the alleged trespass was committed be vested in the United States. Section 1165 provides for several possible combinations of ownership of Indian land. The amended information in this case alleges one of them: "land that belongs to any Indian tribe . . . held by the United States in trust." The phrase "belongs to any Indian tribe" suggests that the Indians should hold legal title; but the phrase "held by the United States in trust" suggests that the United States should hold legal title, with beneficial ownership by the Indians. While the statute is inartfully drawn, I construe it as requiring, as an element of the offense, that the United States hold legal title to the land at issue in trust for the Indians.

**9.** It is well established that the Constitutional provision granting Congress the authority "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," Article I, Section 8, clause 3, gives the federal government an authority, superior to the State's sovereign authority, to regulate navigable waters. *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, at 334, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); *First Iowa Hydro-Electric Cooperative v. Federal Power Commission*, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946). Additionally, the Commerce Clause and the "recognized relation of tribal Indians to the Federal government" confer upon the federal government the authority to make regulations "reasonably essential" to the protection of the Indians. *Morton v. Mancari*, 417 U.S. 535 at 551–552, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Perrin v. United States,* 232 U.S. 478 at 482, 34 S.Ct. 387, 389, 58 L.Ed. 691 (1914). Thus, the federal government clearly had power in 1854 to impose protective regulations upon the navigable waterway at issue. A treaty provision granting exclusive use of a waterway to Indians and excluding non-Indians may reasonably be viewed as a regulation within the Congressional power.

An alternative way to define a grant of exclusive use of a navigable waterway is as an appropriation of the waters for the use of the Indians. It is clear that the federal government has the power to make such an appropriation. *Cappaert v. United States,* 426 U.S. 128, at 138, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976); *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). *See also* Cohen, *Handbook of Federal Indian Law* at 318 (1971).

Any national government action reserving a public area for the exclusive use of Indians at first may appear to be racial discrimination in violation of the equal protection guarantee implicit in the due process clause of the Fifth Amendment. The unique legal status of tribal Indians and the federal government's duty to protect them, however, is such that special treatment for them does not violate equal protection or due process guarantees "as long as special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, . . ." *Morton, supra,* 417 U.S. at 555, 94 S.Ct. at 2485; *Moe v. Salish and Kootenai Tribes,* 425 U.S. 463, at 479–480, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

The interpretation of § 1165 as requiring that legal title be in the United States is supported by the fact that § 1165 is part of a chapter of statutes which begins with a relatively broad definition of "Indian country." This definition applies to all but two sections of the chapter. This definition of "Indian country" does not include title as one of the required elements. Yet when Congress enacted § 1165, it chose to include a narrower definition of Indian land in the section, in language indicative of a requirement of title in the United States.

This interpretation of the language of § 1165 is supported by *United States v. Finch,* 548 F.2d 822 (9th Cir. 1976) and *United States v. Pollmann,* 364 F.Supp. 995 (D.Mont.1973), both cases in which defendants prosecuted under § 1165 maintained that their alleged offenses had not taken place on Indian land, as defined by § 1165. In *Finch,* the court held that its decision about the applicability of § 1165 was controlled by two Supreme Court cases involving the title to lands underlying navigable waters. *Supra* at 827. Similarly, in *Pollmann,* the court began its analysis of the case by determining the ownership of the lake in which defendant had fished, and concluded that the United States held title to the lake in trust for the Indians.

Because title to the navigable waterways within the reservation had passed to the state in 1848, and because that portion of § 1165 pertinent to the present case requires that title be in the United States, this prosecution must fail unless the United States regained title from the State some time after 1848. The only conceivable time and manner of such reacquisition is the 1854 exercise of the treaty power of the national government. Therefore the issue is whether the United States enjoyed the treaty power actually to retake title from Wisconsin and, if so, whether it chose to exercise that power by entering into the 1854 treaty.

The federal government's treaty power:

. . . as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself, and of that of the States. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent.

*Geofroy v. Riggs,* 133 U.S. 258 at 267, 10 S.Ct. 295, 297, 33 L.Ed. 642 (1890). *See also Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

As an incident of national sovereignty, the federal government enjoys the power of eminent domain to take private property for public purposes without the State's consent. *Kohl, et al. v. United States,* 91 U.S. 367, 23 L.Ed. 449 (1875). The power of eminent domain extends to the taking of state-owned property without its consent. *Oklahoma ex rel. Phillips, Governor v. Guy F. Atkinson Co.,* 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941). Additionally, the United States may take property "either by entering into physical possession of the property without a court order, or by instituting condemnation proceedings under various Acts of Congress." *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *United States v. Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958).

However, in exercising the power of eminent domain, the government is limited by the provisions of the Constitution, including the Fifth Amendment prohibition of taking private property without just compensation. Thus, whenever eminent domain is exercised through physical seizure of property, title to the property does not pass to the government until the owner of the property receives compensation for the taking. *Dow, supra* at 21, 83 S.Ct. 379; *Albert Hanson Lumber Co. v. United States,* 261 U.S. 581, 587, 43 S.Ct. 442, 67 L.Ed. 809 (1923). This requirement of compensation before title may pass is as applicable when state-owned lands are taken as when private citizens' lands are taken.

*United States v. Carmack,* 329 U.S. 230 at 242, 67 S.Ct. 252, 91 L.Ed. 209 (1946).[10]

■ Since there is no indication that the government compensated the State for any purported taking of its lands by the 1854 treaty, the United States did not acquire title to the bed of the Kagagon Slough through its legitimate powers of eminent domain. If I were to interpret the 1854 treaty as a taking of the title to the State's property without compensation, that treaty would be in violation of the United States Constitution, and therefore unauthorized and void. I decline so to construe the treaty.

Plaintiff has cited a number of decisions in support of its contention that the United States enjoyed the treaty power in 1854 to grant the Chippewa exclusive use of the navigable waterways in their reservation. Although, as I have pointed out, because of the particular language of § 1165, the issue in this case is the government's authority to take and convey title to the waterway rather than its authority to grant exclusive use to the Chippewa, a brief discussion of the decisions cited by plaintiff may be useful.

In *United States v. Thomas,* 151 U.S. 577, 14 S.Ct. 426, 38 L.Ed. 276 (1894), a defendant in a criminal prosecution challenged the jurisdiction of the federal court, asserting that the part of the Lac Courte Oreilles reservation on which the alleged offense had taken place was within what would have been the sixteenth section of a Wisconsin township. The federal government had pledged in Wisconsin's Enabling Act to donate the sixteenth section of each township to the new state for school purposes. Like the Bad River reservation in the present case, the Lac Courte Oreilles reser-

vation was created after statehood. Thus, the defendant argued that the federal government lacked authority in 1854 to create a reservation on the sixteenth section of a township.

The *Thomas* court held that by the treaty of 1842, the Indians were granted a right of temporary occupancy on the land in question which had not been revoked.[11] Whatever interest the State had acquired in the sixteenth section was subject to the Indians' prior right of occupancy, the court held, and thus the federal government had the authority to create a reservation on that land (151 U.S. 583, 14 S.Ct. 428):

> Whatever right the State of Wisconsin acquired by the enabling act to the sixteenth section was subordinate to this right of occupancy for which the Indians stipulated and which the United States recognized. The general rule established by the land department in reference to the school lands in the different states is that the title to them vests in the several states in which the land is situated, subject to any prior right of occupation by the Indians or others which the government had stipulated to recognize.

The statute dealt with in *Thomas* (section 9 of the Act of Congress of March 3, 1885, c. 341, 23 Stat. 362, 385) conferred jurisdiction upon the federal courts in cases in which an Indian was charged with murdering another person "within the boundaries of any State of the United States, and within the limits of any Indian reservation." Thus, it was not necessary to determine whether the United States or the Indians, on the one hand, or the State, on the other, held actual title to the land in a section 16 in which the offense allegedly occurred. As the passage

---

10. In *Carmack* the Court noted an exception to the rule of just compensation, saying that "when the Federal Government takes property from state ownership merely so as to put it to a federal public use for which the state already holds it in trust, a like obligation does not arise to pay just compensation for it." That exception is not applicable to the present case, however, since the state held the waterway in trust for the common use of all people, while the federal government alleges in this case that the federal public use was to reserve the water for

the exclusive use of the Indians. The two public purposes conflict.

11. A Presidential removal order of 1850 has an important bearing on whether the Indians' right of temporary occupancy had been revoked. This removal order and its legal effect are discussed fully in the opinion in *United States v. Ben Ruby, infra.* When it decided *Thomas,* the Supreme Court of the United States was unaware of the existence of the President's 1850 removal order. See 151 U.S. at 582, 584, 14 S.Ct. 426.

from *Thomas* quoted above reflects ("whatever right the State of Wisconsin acquired . . . ."), *Thomas* is ambiguous at best on the question where title to a section 16 resided, even assuming that the section 16 was included within an Indian reservation.[12]

In *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the issue was whether on certain lands the Indians were governed by state hunting and fishing laws. The Court noted that the Menominees had ceded their Wisconsin lands to the United States in 1848, a few months after statehood, and had agreed to remove to their lands in Minnesota. The removal effort did not succeed, and in 1854 the Menominees acquired a reservation from the United States in Wisconsin by the Treaty of Wolf River. The State argued that between 1848 and 1854, Wisconsin had acquired jurisdiction over the ceded lands; thus, the Menominees had lost their special hunting and fishing rights on those lands and did not regain them with the creation of the reservation in 1854. The Court noted (391 U.S. at 412–413, n. 12, 88 S.Ct. at 1710):

> If any hiatus in title to the reservation lands in question occurred between 1848 and 1854, any jurisdiction that the State may have acquired over those would not have survived the Treaty of 1854. The Treaty of Wolf River was, under Article VI of the Constitution, the "supreme law of the land," and the exercise of rights on reservation lands guaranteed to the tribe by the Federal Government would not be subject to state regulation, at least in absence of a cession by Congress. . . . In this connection it should be noted that in 1853 the Wisconsin Legislature consented to the establishment of the Menominee Reservation subsequently confirmed by the 1854 Treaty (1853 Wis.Jt. Res., c. I), an action which can be fairly construed as a disclaimer of any jurisdiction the State may have possessed.

 Plaintiff argues first that the 1854 Treaty of LaPointe with the Chippewa, like the Treaty of Wolf River with the Menominee, became the supreme law of the land and superseded any state regulation of navigable waterways in the reservation areas. It is axiomatic, however, that a treaty may only become the supreme law of the land if it is a valid treaty. As explained above, a treaty must be constitutional. If the 1854 Treaty of LaPointe is construed as divesting the State of title to the navigable waterways in the Bad River reservation without compensation, it is invalid and void in that respect. The same problem of constitutionality is not raised in the *Menominee* case with respect to the Treaty of Wolf River; it was not contended that the Treaty of Wolf River affected title but only that it affected hunting and fishing regulations by the state.

 Secondly, plaintiff contends that the 1854 Memorial of the Wisconsin Legislature, asking that Congress encourage the permanent settlement of the Lake Superior Chippewa in the State, should be construed as a disclaimer of state jurisdiction, as the 1853 Joint Resolution was construed in the *Menominee* case. A memorial observing in tones of approval, as does the 1854 memorial, that the Indians are intermarrying with whites and are anxious to adopt the habits of whites, and asking Congress "to encourage the permanent settlement of those Indians as shall adopt the habits of the citizens of the United States," cannot be construed to reflect a desire to clear the way for exclusive use of navigable waters by an Indian tribe by disclaiming the State's title. In any event, in *Menominee* the Supreme Court construed the 1853 memorial as a disclaimer of state jurisdiction, presumably jurisdiction to regulate hunting and fishing; the Court was not called upon to construe the memorial as a relinquishment of title to the lands in question, and did not so construe it.

A similar issue was reached in *State v. Gurnoe,* 53 Wis.2d 390, 192 N.W.2d 892 (1971). The State claimed the right to reg-

---

**12.** See a more extended discussion of *Thomas* in my opinion in *United States v. Ben Ruby, et al, infra.* Essentially the same claim was raised in *Wisconsin v. Hitchcock,* 201 U.S. 202, 26 S.Ct. 498, 50 L.Ed. 727 (1906), with regard to lands within the Bad River Reservation. The court dealt with the case summarily, relying upon the reasoning of *Thomas.*

ulate the fishing activities of the Chippewa in areas of Lake Superior adjacent to two of their reservations. The court rejected the State's argument that because the lake was within the State's jurisdiction in 1854, the federal government lacked the treaty authority to give the Chippewa special fishing rights in Lake Superior in that year. Instead, the court held that Congress was empowered to convey fishing rights, that it did so in the treaty of 1854, and that the treaty superseded and limited the State's Enabling Act, which had given the state jurisdiction over fishing in Lake Superior. Again, of course, it was fishing rights rather than title to the waterways which were at stake, and *Gurnoe* does not reach the present issue.

The government's citations to *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) and *United States v. Brown,* 552 F.2d 817 (8th Cir. 1977), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266, fail on the same distinction; they involved regulation of federally-owned property rather than federal acquisition of title to state property.[13]

If § 1165 were civil rather than criminal, it might be possible to construe it liberally and consistently with its purpose so as to require only that the land be reserved for the exclusive use of the Indians, regardless of the locus of legal title. But § 1165 is criminal. Since the title to the Kagagon Slough vested in the State of Wisconsin upon its admission to statehood in 1848, and since the United States did not have the treaty power to divest the State of that title without reimbursement, title to the Slough remains in the State. Thus, the Kagagon Slough does not belong to any Indian tribe nor is it held in trust by the United States. It is true that the amended information alleges that the Kagagon Slough does so belong and is so held. However, it goes on to articulate the basis for those allegations, namely the treaties of 1842 and 1854, thus making it vulnerable to a motion to dismiss for failure to allege an offense within the meaning of § 1165.

Accordingly, defendant's motion to dismiss the amended indictment must be granted. An order granting it appears at the foot of this entire opinion.

**13.** The opinion of the Court in *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) includes language which could be construed in support of plaintiff's position in this case. The issue in *Arizona* was proper allocation of the water in the Colorado River for irrigation, drinking, and other purposes. Arizona challenged the validity of a master's allocation of some of the water to an Indian reservation in Arizona. The Court held at 597–598, 83 S.Ct. at 1496:

> Arizona's contention that the Federal Government had no power, after Arizona became a State, to reserve waters for the use and benefit of federally reserved lands rests largely upon statements in *Pollard's Lessee v. Hagan,* 3 How. 212, [11 L.Ed. 565] (1845) and *Shively v. Bowlby,* 152 U.S. 1, [14 S.Ct. 548, 38 L.Ed. 331] (1894). Those cases and others that followed them gave rise to the doctrine that lands underlying navigable waters within territory acquired by the Government are held in trust for future States and that title to such lands is automatically vested in the States upon admission to the Union. But those cases involved only the shores of and lands beneath navigable waters. They do not determine the problem before us and cannot

> be accepted as limiting the broad powers of the United States to regulate navigable waters under the Commerce Clause and to regulate government lands under Art. IV, § 3, of the Constitution. We have no doubt about the power of the United States under these clauses to reserve water rights for its reservations and its property.

From the statement limiting *Pollard's Lessee* and *Shively* as relevant only to title to the shores and beds of navigable waters, it might be inferred that title to navigable waters is not held by the state. *But see Port of Seattle v. Oregon & W. R.R.,* 255 U.S. 56 at 63, 41 S.Ct. 237, 65 L.Ed. 500 (1921); *Donnelly v. United States,* 228 U.S. 243 at 260, 33 S.Ct. 449, 57 L.Ed. 820 (1913). But the context of that statement shows that title was not an issue in *Arizona*; rather the issue was the federal government's power to regulate and use navigable waters for a federal reservation. Thus a holding in this case that the federal government had the authority to grant exclusive use of the Kagagon Slough to the Indians, but did not have the authority to divest the state of its title to that waterway without compensation, is consistent with the *Arizona* decision.

United States v. Ben Ruby, et al., 72–C–366

This is a civil action instituted by the United States to clear title to certain lands in Wisconsin. Jurisdiction is present. 28 U.S.C. § 1345. The case is currently before the court on defendants' motions for summary judgment,[14] and plaintiff's cross-motion for summary judgment.

The specific lands at issue are Section 16 in Township 39 North, Range 7 West, Section 16 in Township 39 North, Range 8 West, and Section 16 in Township 40 North, Range 8 West, all in the Fourth Principal Meridian, Sawyer County, Wisconsin. Plaintiff claims that it holds fee simple title to those lands in trust for the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, pursuant to Treaties of 1837, 1842 and 1854, and executive action establishing the Lac Courte Oreilles reservation in 1873. Defendants are the State of Wisconsin and private parties who claim interests in parts of the sections 16 at issue through patents initially granted by the State. Some of the defendants have not been served with a summons and complaint. Those who have been served claim that by virtue of the August 6, 1846, Act of Congress enabling the territory to form a constitution and state government, and the 1848 Act admitting Wisconsin to the Union, the interests of the United States and the interests of the Indians in the lands at issue were extinguished and title was acquired by the State.

The parties have submitted affidavits and numerous documents to the court. From those submissions and upon the basis of the entire record herein, I find that there is no genuine issue as to the material facts set forth under the heading "Facts" in the opening portion of this consolidated opinion and order in these three cases.

### Estoppel

Defendants contend that the United States is estopped by three actions from claiming title to the sections 16 at issue:

the Secretary of the Interior recognized the State's title to those lands in 1873; the Commissioner of the General Land Office recognized the State's title to those lands in 1918; and the United States purchased some of those lands in 1936 and 1937.

Defendants recognize an exception to the doctrine of estoppel when in its sovereign capacity the United States attempts to carry out engagements made by it with Indian tribes. *United States v. Brookfield Fisheries*, 24 F.Supp. 712 (D.Or.1938). But defendants contend that the exception does not apply in this case because the United States had no treaty obligation to provide the Chippewa with occupancy of the sections 16 at issue. The existence or non-existence of such a treaty obligation is an issue going to the merits of this case. When the United States asserts the existence of such a treaty obligation, the claim must come within the exception to the estoppel doctrine; to estop the court from reaching the merits of the claims of a treaty obligation would defeat the purpose of the exception. *See also United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, at 360, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *Cramer v. United States*, 261 U.S. 219 at 234, 43 S.Ct. 342, 67 L.Ed. 622 (1923); *State of New Mexico v. Aamodt*, 537 F.2d 1102 (10th Cir. 1976); and *United States v. Ahtanum Irrigation District*, 236 F.2d 321 at 334 (9th Cir. 1956), where the courts held that the United States cannot be estopped from making a claim as trustee for or on behalf of an Indian tribe. I proceed to the merits.

### United States v. Thomas

The United States contends that the specific issue has been decided in its favor by the Supreme Court of the United States in *United States v. Thomas*, 151 U.S. 577, 14 S.Ct. 426, 38 L.Ed. 276 (1894). I must determine whether the specific issue present-

14. Defendant State of Wisconsin and defendant Owens-Illinois Glass Company each has moved for summary judgment. I have previously ordered that every defendant who has appeared in this action would be considered a co-movant with the State and Owens-Illinois in those motions. Because I think it just to protect all defendants who have been served with a summons and complaint regardless of their appearance or non-appearance in the case, I now construe the defendants' motion for summary judgment as being on behalf of every named defendant who has been served.

ed here was indeed decided in *Thomas* and, if so, whether I am bound by that decision.

I conclude that *Thomas* did not hold that title in fee to the disputed sections 16 is in the United States, and that even if such a holding were to be inferred from the language of the opinion, I am not bound by it.

Some time shortly before 1893 an indictment was returned in the federal court in this district against the defendant Thomas, a member of the Chippewa tribe, charging him with murdering a person within the Lac Courte Oreilles reservation. A verdict of guilty was returned against him. Defendant moved to set aside the verdict on the ground that the federal court lacked jurisdiction. Under the jurisdictional statute involved, Section 9 of the Act of Congress of March 3, 1885, c. 341, 23 Stat. 362, 385, federal jurisdiction depended upon whether the crime had been committed "within the limits of any Indian reservation." Because the evidence at the trial had tended to show that the offense had occurred within a section 16, and because defendant contended that the particular section 16 had been ceded to the State of Wisconsin pursuant to the statehood enabling Act, he asserted that it could not subsequently be taken by the United States and made a part of an Indian reservation. There was disagreement between the two judges who passed initially on the motion to set aside the verdict, and the jurisdictional question was certified to the Supreme Court.

Thus, the question before the Court was not whether title in fee to the section 16 was in the United States or in the State of Wisconsin, but whether the section 16 was within the limits of the reservation. Of course, it was possible that the Court might have taken the view that unless title in fee resided in the United States when the reservation was created, the section 16 could not lawfully have been included in the reservation. But clearly it did not take that view.

Although the true basis for the holding in *Thomas* is obscure, it appears that the Court found jurisdiction to be present in the federal court on one or more of three grounds: (a) By the treaty of 1842, the Chippewas were granted the right of occupancy to the section 16 in question. This right was never terminated by them or by the United States by the treaty of 1854 or otherwise. Any title which may have vested in the State was subordinate to this right of occupancy. (b) In light of the considerations stated in (a), the State had no control over or right to the section 16 in question such as to prevent its inclusion in the reservation provided for in the treaty of 1854, and it was so included. (c) "[I]ndependently of any question of title," 151 U.S. at 585, 14 S.Ct. at 429 (that is, presumably, even if the State had acquired earlier title in fee unencumbered by any right of occupancy by the Chippewas), because of the special guardian-ward relationship between the national government and the Indians, it was within the power of the national government to assert the jurisdiction of its courts over certain acts by Indians committed within certain geographical areas described as "reservations."

Obviously, ground (c) is unrelated to the contention by the United States in the present case that it holds fee simple title to the sections 16 in question.

With respect to grounds (a) and (b), the opinion in *Thomas* plainly does not reject the proposition that title to the sections 16 in question had passed from the United States to the State, although it does reject the proposition that the State's title was of such a nature as to extinguish the Chippewas' right of occupancy or as to prevent the inclusion of the sections 16 "within the limits of any Indian reservation" as that phrase is used in the statute vesting in the federal court jurisdiction over certain crimes by Indians. For example, the Court stated (at 583, 14 S.Ct. at 428): "Whatever right the state of Wisconsin acquired by the enabling act to the sixteenth section was subordinate to this right of occupancy . . . ." The Court cited with approval (at 583) the general rule of the Land Department that title to school lands "vests in the several states in which the land is situated, subject to any prior right of occupation by the Indians . . . ." It also

cited with approval (at 583–584, 14 S.Ct. at 428) a previous decision in *Beecher v. Wetherby*, 95 U.S. 517, 24 L.Ed. 440 (1877), in which it had been held that the State could take the "naked fee" to Indian occupied school lands, but could not disturb the occupancy of the Indians. The Court concluded (at 584–585, 14 S.Ct. at 429) that "title [to the section 16 at issue] never vested in the state, except as subordinate to that right of occupation of the Indians."

Because in *Thomas* the Supreme Court did not sustain the contention presented by the United States in the present case, it should be unnecessary to discuss the doctrine of *stare decisis* with respect to *Thomas*. Nevertheless, *Thomas* dealt with a section 16, and a section 16 in the very reservation involved in the present controversy. Also, a measure of obscurity marks the rationale of the *Thomas* decision. Conceivably another court may read *Thomas* differently. Therefore, I will assume, although disagreeing with the assumption, that implicit in the *Thomas* holding is the proposition that the United States enjoys fee simple title to the sections 16 here in issue. The question is whether I am bound by such an implicit holding, as, of course, I would usually be bound.

As I have noted earlier, it has become well established that treaties with the Indians must be construed as the Indians would have understood them as disclosed by the practices and customs of the Indians at the times of negotiation, the history of the treaties including the history of the negotiations, and the practical construction given the treaties by the parties. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970); *United States v. Top Sky*, 547 F.2d 486 (9th Cir. 1976).

In *Thomas*, there was sent up to the Supreme Court the entire record of the proceedings in the trial court. This included the pleadings, the evidence on the trial, and an agreed statement of facts by counsel. Because the case reached the Supreme Court on a certificate of division in opinion between the two judges in the trial court, the Supreme Court held itself limited to consideration of the "pleadings in the case" and "public statutes or treaties bearing upon the point certified." 151 U.S. at 580–581, 14 S.Ct. at 427. The pleadings consist of the indictment, which alleges the elements of the offense and describes the location of the offense as "within the limits of an Indian reservation," and the defendant's not guilty plea. In these pleadings there is no explanation of why the location of the offense may have been within or without the limits of the reservation. Those portions of the record which the Supreme Court declined to consider contained minimal information about the historical context in which the relevant treaties were entered into or about the practical construction afforded the treaties by the parties.

Inasmuch as the Supreme Court felt free in *Thomas* to consider the relevant treaties, it seems that it would have been free to exercise judicial notice of their historical context, as that Court has frequently done. However, in *Thomas* the Court limited its consideration to the language of the 1842 and 1854 treaties.

In the present case in this court, I have taken judicial notice of much historical information included in the record and some not so included.

The contrast between the factual record available to the Supreme Court in *Thomas* and that now available to me is demonstrable as to a matter of true importance. With respect to grounds (a) and (b) for its holding, as I have described them above, the Court referred in *Thomas* (at 584, 14 S.Ct. at 429) to "the fact that the section is included within the tract set aside as a portion of the permanent reservation . . . ." Included in that part of the record in *Thomas* not considered by the Supreme Court was some evidence about the selection of lands for the Lac Courte Oreilles reservation in 1859. But nowhere in the *Thomas* record in the Supreme Court was there information concerning the re-selection of lands in 1873. Without that information about the practical construction the parties had given the treaties (see *United States v. Top Sky, supra*), the Court assumed that the reservation was "to embrace three full townships . . . to be,

as near as possible, in a compact form . . . ." 151 U.S. at 582, 14 S.Ct. at 428. The Court later concluded (151 U.S. at 584, 14 S.Ct. at 429):

> That [1854] treaty provided for permanent reservations, which included the section in question. The treaty did not operate to defeat the prior right of occupancy to that particular section, but, by including it in the new reservations, made as a condition of the cession of large tracts of land in Wisconsin, continued it in force.

As clearly shown by the evidence in this present case, not considered in *Thomas*, the parties to the treaty did not envision a reservation of three "full" townships, but chose the reservation land by sections, both in 1859 and 1873.[15]

The differences between the factual record in *Thomas* and in the present case are such that, even assuming that in *Thomas* the United States was impliedly held to enjoy fee simple title to the section 16, I should not apply that holding mechanically to the present case. Under these circumstances, the doctrine of *stare decisis* is not so rigid as to require me to decide the present case in an unjust manner. *See United States v. Moore*, 62 F.Supp. 660, 663 (W.D.Wash.1945), *aff'd* 157 F.2d 760 (9th Cir.), *cert. denied* 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277.

Accordingly, in this case I will make a fresh analysis of the issue of title to the sections 16 in light of the historical facts as I have found them.

### The parties' theories

There are three parties or groups whose interests are implicated in this quiet title action: the Lac Courte Oreilles Band, which is not a party but appears *amicus*; the plaintiff United States; and the defendant State of Wisconsin and those who claim interests through the State (in this paragraph I will refer to this latter group as the State). By initiating the lawsuit, the United States has presented a thesis: that it holds title in fee to the disputed sections 16 for the benefit of the Band. If the United States succeeds in obtaining a declaratory judgment to this effect, the interest of the State will be extinguished; since the United States and the Band are allied in interest, the entire controversy will be resolved. But in the defense of this case, a counter-thesis has been presented: that during a period from 1846 to 1873 events occurred as a result of which unencumbered title to the disputed sections 16 vested in the State. If defendants succeed in obtaining a declaratory judgment to this effect, the interest of the United States will be extinguished. Because the Band is not a party to this action, its interest, if any, will not be extinguished, but, of course, the precedential effect of the declaratory judgment in this case will become a grave obstacle for the Band to overcome in any future litigation.

I have decided that the following opinion will probably be more understandable if it is organized in terms of the defendants' counter-thesis. Defendants' counter-thesis

---

**15.** The record before the Supreme Court in *Thomas* contained no evidence of the President's 1850 removal order. That this omission was a critical factor in the Court's decision is indicated by this language (151 U.S. at 582 and 584, 14 S.Ct. at 428, 429):

> The Indians have never been removed from the lands thus ceded, and no executive order has ever been made for their removal, and no change has taken place in their occupancy of the lands, except as provided by the treaty of September 30, 1854, 10 Stat. 1109.

> . . . . . .

> We, therefore, are of opinion that by virtue of the treaty of 1842, in the absence of any proof that the Chippewa Indians have surrendered their right of occupancy, the right still remains with them, and that the title and right which the State may claim ultimately to

the sixteenth section of every township for the use of schools is subordinate to this right of occupancy of the Indians, which has, so far as the court is informed, never been released to any of their lands, except as it may be inferred from the provisions of the treaty of 1854.

For reasons stated hereinafter, I do not consider the President's 1850 removal order dispositive of the issue whether the United States now holds fee simple title to the sections 16 at issue. Therefore, the Supreme Court's lack of awareness in *Thomas* of the existence of that order is not of critical significance presently. But this lack of awareness of a major event illustrates rather dramatically the handicap imposed upon the Supreme Court by the narrowness of the factual record it considered.

begins with the enabling Act of 1846 by which all sections 16 within public lands and within the boundaries of the proposed State of Wisconsin would be granted to the State except "where such section has been sold or otherwise disposed of." The grant of particular sections 16 to the State was to occur when a survey which included them was accepted by the Surveyor General of the United States. In 1848 Wisconsin became a State. Defendants contend: The sections 16 at issue were public lands. They had not "been . . . otherwise disposed of." If it should be held that as of 1846 or 1848, they had been otherwise disposed of in the sense that the Indians retained certain rights of occupancy following the treaties of 1837 and 1842, these rights were terminated by the Presidential removal order of 1850. If it should be held that the removal order did not terminate any rights of occupancy by the Indians then persisting, such rights were terminated under the treaty of 1854 at the time when, pursuant to said treaty, the boundaries of the reservation were finally defined to exclude the disputed sections 16. Thus, the argument runs, the title in the United States passed to the State when the Surveyor General accepted the survey in 1856, subject to whatever rights to the land were then enjoyed by the Indians, and the State's title became unencumbered when those rights of the Indians, if any, terminated.

I will undertake now to test this counter-thesis as against the contentions raised by the United States and by the Band as *amicus*.

 It has long been accepted in the law of the United States that Europeans who conquered the North American continent have fee title to the lands they have conquered, while the original inhabitants of those lands, the Indians, have a continued right to occupy their lands. This right of occupation is frequently called "aboriginal" or "Indian" title. *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955); *see also Johnson v. McIntosh*, 21 U.S. (8 Wheat) 543, 5 L.Ed.2d 681 (1823). Aboriginal title is defined as title based upon actual, exclusive and continuous occupancy for a long time. *Strong v. United States*, 518 F.2d 556, 207 Ct.Cl. 254 (1975); *Sac and Fox Tribe of Indians of Oklahoma v. United States*, 315 F.2d 896, 161 Ct.Cl. 189 (1963), *cert. den.* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165. Only the sovereign, the United States, may extinguish that aboriginal title. *Oneida Indian Nation v. County of Oneida, N. Y.*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974).

Another kind of Indian title to lands is "recognized" or "treaty" title, defined as an acknowledgment by the United States that the Indians have a legal right permanently to occupy and use a certain tract. When the United States acknowledges that the Indians have a legal right of occupancy and use, but less than permanently, it is described as a right of "permissive occupation." *Tee-Hit-Ton Indians, supra; Strong, supra; Sioux Tribe v. United States*, 500 F.2d 458, 205 Ct.Cl. 148 (1974); *Sac and Fox Tribe, supra.*

The evidence indicates, and I will assume for the purposes of evaluating the claims in this case, that the Chippewa had aboriginal title to the land at issue in northern Wisconsin at least until 1837.

It is the fee title based on the European conquest which the United States asserts in this suit, and which the State contends was granted it by the United States through the 1846 enabling Act of Congress.

Whether, beginning in 1837, the Chippewa lost their aboriginal title but retained rights in the disputed land and, if so, what was the nature of those rights are matters that require inquiry.

### From aboriginal title to right of permissive occupation

 Extinguishment of Indian title may be "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise . . . ." *United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339 at 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941). "But an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Id.* at 354, 62 S.Ct. at 255. *See*

*also United States v. Gemmill*, 535 F.2d 1145 (9th Cir. 1976); *State of New Mexico v. Aamodt*, 537 F.2d 1102 (10th Cir. 1976); *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 206 Ct.Cl. 649 (1975); *United States v. Kiowa, Comanche, and Apache Tribes of Indians*, 479 F.2d 1369, 202 Ct.Cl. 29 (1973), *cert. denied Wichita Indian Tribe of Oklahoma v. United States*, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287.

In the present case, it is quite clear that the United States intended to extinguish the Indians' aboriginal title to the land ceded in 1837. It sought to end the exclusivity of their occupation by opening the land for white settlement, and it sought the right to establish logging camps without fear of reprisal by the Indians. Those purposes were clearly contrary to the Indians' right to exclusive occupation of the land, and thus required termination of that right.

▮ However, as I pointed out in *United States v. Bouchard, supra*, treaties with Indians must be construed as the Indians would have understood them. *See Choctaw Nation v. Oklahoma, supra; Choctaw Nation v. United States*, 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306 (1886); *Worcester v. Georgia*, 31 U.S. (6 Peters) 515, 8 L.Ed. 483 (1832); and the cases cited at footnote 7.

Even applying liberal rules of treaty construction to the 1837 treaty, I conclude that when they signed it, the Indians knew they were relinquishing significant rights in their land, including the right to expel whites who worked or settled in the territory. Probably the Indians did not understand legal concepts of title and aboriginal title, but the remarks of the spokesman Aish-ke-bo-gi-ke-she on the last day of the treaty council indicate their understanding of a relinquishment of significant rights in the land: "Your children are willing to let you have their lands, but they wish to reserve the privilege of making sugar from the trees and getting their living from the Lakes and Rivers, as they have done heretofore, and of remaining in [the] country." It is also clear that they understood that white

people would live in the territory, at least to engage in logging. As the Indians' later statements indicate, they understood that they should not attack whites moving onto the ceded lands.

Similarly, in negotiating the 1842 treaty, in which the Chippewa ceded more lands and agreed that the Lake Superior and Mississippi tribes would share annuities from both treaties, the Indians knew they were relinquishing significant rights in their land, and that they would be required to share occupancy with soldiers, loggers and miners. When the removal order came in 1850, the interpretations the Indians gave to the treaty show that they understood they could be removed from the land at some time; the dispute concerned the time and the reasons for removal. The 1837 and 1842 treaties were quite similar and appeared to be closely linked in the minds of the Indians, so their interpretation of one treaty is probative of their understanding of the other.

Accordingly, I conclude that the Indians relinquished their aboriginal right of occupancy to the land at issue in 1837. Since the right of occupancy which they reserved was clearly not a permanent right, they retained only the right of "permissive occupation." *See also Mole Lake Band, et al. v. United States*, 139 F.Supp. 938, 134 Ct.Cl. 478 (1956), *cert. denied*, 352 U.S. 892, 77 S.Ct. 130, 1 L.Ed.2d 86.

### The 1850 removal order

▮ Defendants argue, then, that the President's removal order of 1850 terminated the right of permissive occupation granted by the 1837 treaty. Plaintiff and *amicus* make a number of arguments in response.[16]

Of these, the principal contention is that made by *amicus* to this effect: The 1850 removal order was not authorized by the 1837 and 1842 treaties, and so was invalid. The words of both the treaties of 1837 and 1842 allow removal at the "pleasure of the President," but the minutes of the 1837

---

16. The Lac Courte Oreilles Band filed an *amicus* brief in support of the plaintiff's motion for summary judgment in this case.

treaty council and the recollection of those involved in the 1842 treaty negotiations indicate that those words were orally modified by the treaty commissioners. The President was not given unlimited discretion by the treaties to order removal, but rather discretion limited by the treaty commissioners' oral assurances to the Indians that they would probably not be removed for a long time, perhaps never, as long as they did not "misbehave" by harassing white settlers. They did not misbehave.

As I noted above, it is clear that in construing a treaty with the Indians, the court should look beyond the words of the treaty to the negotiations and other circumstances, and that considerable weight should be given to the Indians' reasonable understanding of the treaty.

Indicating the Indians' expectation of a long-term occupancy, in 1837 an Indian spokesman sought an annuity for sixty years, saying: "At the end of that time our grandchildren who will have grown up, can speak to you for themselves." And on the final day of treaty negotiations in 1837, an Indian spokesman told Commissioner Dodge of the Indians' dependency on the land for their survival: "You know we can not live, deprived of our Lakes and Rivers; There is some game on the lands yet; and for that reason also, we wish to remain upon them, to get a living." Commissioner Dodge replied in part that it would "probably be many years before your Great Father will want all these lands for the use of his White Children." Similarly, both Indians and non-Indians who were present at the 1842 treaty negotiations later wrote that the Indians were assured that they would not be required to remove from their lands for a long time, possibly never, unless they misbehaved in some way. This assurance was important to their agreement to sign the treaty.

It appears quite reasonable, and eminently just, to construe the 1837 and 1842 treaties as implying the limitation that the President could not require removal for many years, unless the Indians seriously misbehaved.

The question arises whether the condition precedent to a valid removal order had been met when the 1850 order was promulgated.

I have found no direct evidence of the President's reasons for issuing the 1850 removal order. But it does appear that the order was recommended by the Commissioner of Indian Affairs and the Interior Department. Thus, the best evidence of the reasons for removal is the reports and actions of the Commissioner of Indian Affairs in 1846 through 1849. That evidence reflects the Commissioner's overriding concern with accomplishing the Bureau's long-term goal to remove all Indians to locations west of the Mississippi and to confine them to small areas where government officials could civilize them more easily.

The 1846, 1847, and 1848 reports do not mention Chippewa misbehavior as a reason for removal, focusing rather on the benefits of removal to the Indians and the government. The 1849 report mentions possible Indian misbehavior only in the most general terms, referring to the "tranquility of citizens who suffer annoyance and loss from depredations." Similarly, the Minnesota assembly resolution is vague about Indian behavior, noting the need to "ensure the security and tranquility of the white settlements." In addition, the assembly's resolution suggests another reason for its removal request by its mention of the Indians' "extensive and valuable district." The LaPointe sub-agents were more specific about conflicts between whites and Indians in 1847 and 1849. Yet in 1847 the sub-agent's conclusion was that whites, rather than Indians, had misbehaved. In 1849 the sub-agent did not assign guilt for the disturbances between the races, other than to blame Indian misconduct on the Indians' easy access to whiskey. The Indians, the missionaries and the miner who protested the issuance of the removal order by letters written in 1851 indicate that conflicts between whites and Indians were infrequent and of the type likely to occur whenever people live in close proximity to one another.

The Commissioner's attempt to obtain Chippewa agreement to removal in 1847

also indicates a policy motive, rather than punitive motive, for his removal efforts.

In sum, the evidence before this court does not reveal the kind of serious misbehavior by Indians which would have justified removal under the terms of the 1837 and 1842 treaties. Rather it appears that the President and other governmental officials were influenced by the long-term goal of the Interior Department to remove all Indians to locations west of the Mississippi where they could be confined to small areas and forced to adopt what these officials considered to be the civilized ways of the white people. Thus, I hold that the removal order of 1850 was not authorized by the treaties of 1837 or 1842, was beyond the scope of the President's powers, and was without legal effect. Any forcible removal of the Indians which may have taken place pursuant to that order was also without legal effect. *See United States v. Santa Fe*

*Pacific R. Co.*, 314 U.S. 339 at 355–356, 62 S.Ct. 248, 256, 86 L.Ed. 260 (1941), where the court held:

> Their [an Indian tribe's] forcible removal in 1874 was not pursuant to any mandate of Congress. It was a high-handed endeavor to wrest from these Indians lands which Congress had never declared forfeited. No forfeiture can be predicated on an unauthorized attempt to effect a forcible settlement on the reservation, unless we are to be insensitive to the high standards for fair dealing in light of which laws dealing with Indian rights have long been read.

*See also Turtle Mountain Band of Chippewa Indians v. United States*, 490 F.2d 935, 203 Ct.Cl. 426 (1974).

Accordingly, I conclude that neither the removal order nor the attempted, but largely unsuccessful, removal efforts terminated the Chippewa's treaty right to occupy the land at issue.[17]

---

17. My holding that the 1850 removal order was invalid makes it unnecessary to pass upon other contentions by *amicus* about that order. However, a few comments on them seem appropriate.

*Amicus* points out that the removal order revokes the privileges granted to the Mississippi tribe by the 1837 treaty and the rights granted the Lake Superior and Mississippi tribes by the 1842 treaty. Since Lac Courte Oreilles is a Lake Superior tribe which was a party to the 1837 treaty, *amicus* contends that its 1837 treaty privileges were exempted from the revocation. The 1837 treaty was with the Chippewa Nation, making no tribal distinction. It was later determined that only Mississippi Chippewa would receive the treaty annuities. When the 1842 treaty was negotiated, the 1837 treaty was referred to incorrectly as one "made with the Chippewas of the Mississippi." (Article V). It is highly probable that the removal order language was based upon this incorrect language of the 1842 treaty. The evidence shows that the purpose of the removal order was to move all of the Indians to locations west of the Mississippi River, to clear the way for white settlement, and that both the Indians and the United States construed the removal order as requiring removal of all Chippewa in Wisconsin.

*Amicus* argues that the removal order was repealed by an executive order in 1852. There is no written record of the executive order to which *amicus* refers, except for Armstrong's report that the President told the Indians in 1852 that he would countermand the removal

order, and that the President gave Chief Buffalo a written instrument explaining his promises. Armstrong records the promise of a countermand as a promise of future action. Another indication of the futurity of any Presidential promise which may have been made is that when Buffalo explained the President's promises to the Chippewa, he told them that they had one more treaty to make with the President.

Plaintiff and *amicus* contend that because the removal order did not result in actual removal by the Chippewa, it should be held to have had no legal effect on the Chippewa's right to occupy the ceded territory. If the order was valid and was not repealed, it terminated the Indians' treaty right of permissive occupation. Whether the Indians actually complied with the order does not affect its legal status. A valid removal order would have left the Indians without any legal interest in the land, permitting fee title to pass to the state unencumbered, pursuant to the enabling Act's provisions. To the extent that language in *United States v. Thomas*, 151 U.S. at 582, 14 S.Ct. at 428, may suggest that both a valid removal order and actual removal were necessary to terminate the Indians' right of permissive occupancy, it must be considered pure dicta in light of the Court's mistaken belief that no removal order was ever promulgated. *State v. Gurnoe*, 53 Wis.2d 390, 406–407, 192 N.W.2d 892 (1972), does support plaintiff's contention that lack of compliance with the 1850 removal order rendered it "ineffective" and that the order "did not result in actual revocation" of pre-existing Indian rights. I respectfully disagree with this view of the

*Effect of 1854 treaty on ceded lands not included in the contemplated reservation*

The next question, therefore, is this: Was the effect of the 1854 treaty to terminate the Chippewa's right of permissive occupation in that territory ceded in 1837 and 1842 and not included in the reservation contemplated by the 1854 treaty?

The United States Court of Claims has succinctly summarized current principles for determining whether establishment of a reservation extinguishes Indian rights to land outside the reservation. In *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, at 1388, 206 Ct.Cl. 649 (1975) it is said:

It should be clear by now that the creation of an Indian reservation does not invariably extinguish aboriginal title claims to outlying areas. In *Santa Fe* [314 U.S. 339, 62 S.Ct. 248 (1941)], the Supreme Court dispelled any notion that the establishment of a reservation automatically destroys Indian title claims based upon aboriginal ownership. *See, id.*, 314 U.S. at 351–56, 62 S.Ct. 248. As this court has most recently stated in *Gila River, supra*, 494 F.2d [1386] at 1390, 204 Ct.Cl. [137] at 144: "[t]here is no Procrustean rule that the creation of a reservation rigidly stamps out aboriginal rights." The particular facts and circumstances surrounding the establishment of a reservation in a given historical context may be such that that event will be deemed to have constituted a relinquishment of tribal claims to lands outside the reservation. But the rule to be followed, as succinctly and well stated by the court in *Turtle Mountain Band, supra*, 490 F.2d [935] at 946, 203 Ct.Cl. [426] at 446, is that " * * * Indian settlement on a reservation should be seen as an abandonment of claims only when the specific circumstances warrant that conclusion."

Although the passage just quoted refers to aboriginal title claims, it seems equally applicable to claims to the right of permissive occupation.

In *United States v. Santa Fe Pacific R. Co.*, referred to in the passage just quoted, Congress had first established a reservation for the Walapai Indians by legislation. The Court reviewed the legislative history of the act, concluding that Congress intended to make an offer to the Walapais to provide a reservation only if they would forsake their ancestral lands. The Walapais did not agree to abandon their lands and did not accept the Congressional offer, the Court found, so there was no extinguishment of their claims to non-reservation lands. However, a "quite different" situation had arisen later, in 1881, when the tribal council presented a proposal to a federal military officer to establish a reservation for them. Pursuant to that recommendation a military reservation was constituted in 1881, and approved as the Walapai Indian Reservation by the President in 1883. The court found "an indication that the Indians were satisfied with the proposed reservation," and concluded (314 U.S. at 357–358, 62 S.Ct. at 257):

[I]n view of all the circumstances, we conclude that its creation at the request of the Walapais and its acceptance by them amounted to a relinquishment of any tribal claims to lands which they might have had outside that reservation

. . . .

The court explained its holding further (at 358, 62 S.Ct. at 257):

The lands were fast being populated. The Walapais saw their old domain being preempted. They wanted a reservation while there was still time to get one. That solution had long seemed desirable in view of recurring tensions between the settlers and the Walapais. In view of the long standing attempt to settle the Walapais' problem by placing them on a reservation, their acceptance of this reservation must be regarded in law as the equivalent of a release of any tribal rights which they may have had in lands outside the reservation. They were in substance acquiescing in the penetration

Supreme Court of Wisconsin. In any event, in *Gurnoe*, the Court decided (at 406, 192 N.W.2d 892), on wholly distinct grounds, that the 1854 treaty terminated whatever previous legal effect the 1850 removal order may have had upon the Indians' fishing rights in Lake Superior.

of white settlers on condition that permanent provision was made for them too. In view of this historical setting, it cannot now be fairly implied that tribal rights of the Walapais in lands outside the reservation were preserved. That would make the creation of the 1883 reservation, as an attempted solution of the violent problems created when two civilizations met in this area, illusory indeed. We must give it the definitiveness which the exigencies of that situation seem to demand. Hence, acquiescence in that arrangement must be deemed to have been a relinquishment of tribal rights in lands outside the reservation and notoriously claimed by others.

With the major exception that violent conflict seems to have been absent in Wisconsin, the circumstances surrounding the establishment of the Chippewa reservations by the treaty of 1854 are somewhat similar to those enumerated in *Santa Fe, supra.* The Chippewa had been ordered to remove, and pursuant to that order had made several disastrous trips to Minnesota to receive their annuities. Clearly, they wanted to remain on their ceded lands: they had petitioned Congress in 1849 for permanent reservations; they had refused to remove when ordered to do so; and Indian Agent Gilbert had reported in 1853 that possible removal was the "great terror of their lives." Additionally, 1854 treaty interpreter Armstrong wrote that the Indians had agreed not to give any more lands unless the government gave them "reservations at different points of the country . . . that should afterwards be considered their bona fide home."

■ The facts surrounding the 1854 treaty indicate that both the United States and the Indians perceived it as extinguishing Chippewa rights to occupy lands outside the reservation. The Commissioner of Indian Affairs noted in 1854 that it might be necessary to allow the Chippewa to remain on ceded lands in "small reservations." And Chief Buffalo stated during treaty negotiations that the Indians understood that the whole of their lands, "with the exception of what we shall reserve, goes to the great father forever."

The language of the 1854 treaty supports this interpretation. Article 11 provides: "[S]uch of them [the Chippewa] as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President." The "territory hereby ceded" in the 1854 treaty was territory in northern Minnesota which was wholly separate and distinct from that ceded in 1837 and 1842. The 1854 treaty contains no other language preserving rights of permissive occupation in the Indians. In the 1837 and 1842 treaties the parties had expressly preserved the rights of permissive occupation in the territories then ceded. Had they intended the 1854 treaty to continue to preserve those rights in the territory ceded in 1837 and 1842, it is reasonable to believe that they would have made it explicit in 1854.

I conclude that by the treaty of 1854, the Chippewa surrendered their rights of permissive occupation in the territory ceded in 1837 and 1842, except to the extent that portions of the territory so ceded were to become parts of the reservations provided for in the treaty of 1854.

### *The exclusion of the sections 16 at issue from the reservation*

■ I must determine, then, the time at which the Lac Courte Oreilles reservation provided for in the 1854 treaty actually came into being and whether the sections 16 at issue were included in it.

The pertinent words of the treaty of 1854 are:

The United States agree to set apart and withhold from sale, for the use of the Chippewas of Lake Superior, the following described tracts of land, viz:

. . . . .

3d. For the other Wisconsin bands, a tract of land lying about Lac De Falmbeau, and another tract on Lac Courte Oreilles, each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President.

The facts relating to the subsequent selection of specific boundaries, as I have found them, may be summarized as follows: A survey of the land in the vicinity of Lac Courte Oreilles was made in 1855 and accepted by the Surveyor General on February 20, 1856. In 1859, a special agent was appointed by the Office of Indian Affairs to confer with the Lac Courte Oreilles chiefs to select a tract "equal in extent to three townships . . . ." The instructions were that the selection should be made from nine townships which had been reserved for the purpose. The lands selected by the chiefs and the federal agent in 1859 included all of each of two townships and parts of three other townships. Uncertainties arose, however, concerning the exact location of some of the boundaries, and difficulties persisted until December 18, 1872, when the Indian Agent was instructed by the Commissioner of Indian Affairs to adjust the selection; these instructions included a specific instruction to omit all sections 16 from the final selection. On February 13, 1873, the final list, omitting any section 16, was presented to the Acting Commissioner and it was approved by the Secretary of the Interior on March 1, 1873.

In opposing the view that the reservation provided for in the 1854 treaty was not created until the boundaries had been defined in 1859, and amended in 1873, plaintiff makes two contentions. One is that although the provisions of the 1854 treaty left the outer boundaries of the reservation undefined, a reservation which included the disputed sections 16 came into being when the treaty was entered into. The second and somewhat related point is that following the execution of a treaty, when Indians proceed to occupy a parcel of land without objection from the United States, that parcel becomes the reservation; and that the sections 16 at issue were included within lands so occupied by the Chippewa following the execution of the 1854 treaty. Plaintiff cites several decisions as supportive of one or both of these contentions.

In *Minnesota v. Hitchcock*, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954 (1902), the issue was whether a certain tract was a reservation or unceded Indian country. The Court held that it was a reservation, saying (at 389–390, 22 S.Ct. at 657):

> While there was no formal action in respect to the remaining tract, the effect was to leave the Indians in a distinct tract reserved for their occupation, and in the same act this tract was spoken of as a reservation. Now, in order to create a reservation it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes. Here the Indian occupation was confined by the treaty to a certain specified tract. That became, in effect, an Indian reservation.

In *Spalding v. Chandler*, 160 U.S. 394, 16 S.Ct. 360, 40 L.Ed. 469 (1896), the Indians had sold to the government land at Sault Ste. Marie, retaining a privilege of fishing at the falls there, along with a convenient encampment. The Indians encamped at the "convenient encampment" at the time the treaty was signed in 1820 until the time of the lawsuit, and the place was marked as an Indian reserve on maps of the area. A dispute arose when a white man attempted to gain title to the area by squatting there. The court held that the Chippewa were in actual use and occupancy of the land from 1820, and that both parties to the treaty had accepted the tract as a reservation, concluding: "If the reservation was free from objection by the government, it was as effectual as though the particular tract to be used was specifically designated by boundaries in the treaty itself." 160 U.S. at 404, 16 S.Ct. at 364.

In *United States v. Carpenter*, 111 U.S. 347, 4 S.Ct. 435, 28 L.Ed. 451 (1884), the government had agreed to reserve from sale, for the use of the Indians, a specific area, the Red Pipestone Quarry, or so much of the quarry as necessary for the Indians to procure stone for pipes. Through government error, a conflicting appropriation of part of the quarry was made and a title dispute arose. The Court held that after the treaty and until a specific portion of the quarry was set aside for Indian use,

the whole of the quarry was withdrawn from private entry or appropriation until the government determined whether any lesser portion than the whole should be reserved for the Indians' use: "[T]he treaty was notice that a part of the quarry would be retained by the government, and that the whole might be, for the use of the Indians." *Id.* at 349, 4 S.Ct. at 436. The boundaries of the quarry were definite, but provisional, boundaries for the reservation.

In *New York Indians v. United States*, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898), the issue was whether a reservation grant made by treaty was *in praesenti* or *in futuro*. One of the major reasons the Court gave for determining that the grant was *in praesenti* was that (170 U.S. at 20, 18 S.Ct. at 535):

> The lands covered by the treaty were identified, described by metes and bounds, and an appropriation was made to aid in the immediate removal of the Indians to their new home. There was no uncertainty as to the lands granted, or as to the identity of the grantees, which, in the case of *Heydenfeldt v. Daney Mining Co.*, 93 U.S. 634 [23 L.Ed. 995,] was held to turn it into a grant *in futuro*.

I read *Minnesota v. Hitchcock, Spalding v. Chandler, United States v. Carpenter*, and *New York Indians v. United States* to support the proposition that definite boundaries are necessary to the creation of an Indian reservation, although that definition may be achieved either by an explicit written description or by long continued and consented to occupation within well understood contours.

In the present case, definition by a final and explicit written description did not occur until 1859 and 1873. The treaty itself did not refer to three specific townships but only to a tract "equal in extent to three townships . . . ." The practical construction given the treaty by the parties five years later was that from an area consisting of nine townships, entire townships or parts of townships were to be selected aggregating in acreage the total acreage of three townships (69,120).

There is no evidence that following the execution of the 1854 treaty, the Lac Courte Oreilles Band commenced a long continued and consented to occupation within well understood contours which included the sections 16 at issue. The record permits no finding as to where the Band was situated from 1854 to 1859. Ambiguous evidence suggests that in 1859 its members were in the vicinity of the Menomonee and Red Cedar Rivers where they had sojourned from "the reservation provided for them at Lac Courte Oreilles." From about 1859 until 1873, it can be inferred that they occupied the lands selected in 1859, which did include the sections 16 at issue. But, of course, any inference that this period of occupation crystallized those boundaries permanently is destroyed by the express choice of different boundaries in 1873.

I conclude that the manner in which the Lac Courte Oreilles reservation was created was by express written agreement as to its boundaries within the broad framework provided for in the 1854 treaty. I also conclude that the time at which the reservation was thus created was 1859, and that the boundaries of the reservation then created were expressly modified by the parties in 1873.

### Nature of Indians' interest from 1854 to 1873

A question arises, then, about the existence and nature of the Lac Courte Oreilles Band's occupancy rights on the lands at issue subsequent to 1854. If by the 1854 treaty the Chippewa surrendered their right to occupy the territory ceded in 1837 and 1842 in exchange for the reservations contemplated by the 1854 treaty, as I have held, it seems clear that they did not surrender the right of permissive occupation until the time at which their reservations had actually been created for their use. It would be unreasonable to construe the 1854 treaty as an immediate relinquishment of occupancy rights by those Indians whose reservations were not immediately established, since the legal effect of such a construction would be that the Indians would

have had no occupancy rights anywhere until the reservation boundaries were established. That clearly is not what the Indians bargained for in 1854. Accordingly, I hold that the Lac Courte Oreilles Band retained its permissive right to hunt, fish, and otherwise occupy all of the ceded lands, including the disputed sections 16, until such time as the boundaries of their reservation were definitively and finally established.

### Manner and timing of creation of State's interest

█ By the 1846 enabling Act, the United States provided for the transfer of its fee title, obtained by the European conquest, to the public land sections 16 within the anticipated boundaries of the prospective state, except "where such section has been sold or otherwise disposed of." Wisconsin was admitted to statehood by Act of Congress in 1848. It has been held that such grants by the United States to the new states become effective when the Surveyor General of the United States approves surveys of the lands affected. *See United States v. Wyoming*, 331 U.S. 440, 443, 67 S.Ct. 1319, 91 L.Ed. 1590 (1947), *United States v. Morrison*, 240 U.S. 192, 201, 36 S.Ct. 326, 60 L.Ed. 599 (1916), *Heydenfeldt v. Daney Gold & Silver Mining Co.*, 93 U.S. 634, 23 L.Ed. 995 (1876).

As of Wisconsin's admission to statehood in 1848, the sections 16 at issue were public lands which the United States had not sold to anyone and which it had not "otherwise disposed of," unless that phrase is construed to cover the agreement by the United States with the Chippewa in the 1837 treaty that the Chippewa would thereafter enjoy the right of permissive occupation of the lands then ceded by the Chippewa (which included the three sections 16). I construe the Acts of Congress in 1846 and 1848 as an expression of the following commitment by the United States to the State: that at such time as the Surveyor General of the United States should approve a survey of the three sections 16 at issue, fee simple title to those sections would pass to the State, subject to the Chippewa's right of permissive occupation recognized by the treaty of 1837 and subject to whatever agreement the United

States might reach with the Chippewa to substitute some other arrangement for the said right of permissive occupation.

In 1854, before these sections 16 had been surveyed on behalf of the Surveyor General, the United States entered into the treaty with the Chippewa which contemplated the creation of reservations, including the Lac Courte Oreilles reservation, as an arrangement to be substituted for the Chippewas' right of permissive occupation of the lands ceded in 1837 and 1842. I consider that as of 1854, following the making of the treaty, the United States remained committed to the proposition that fee simple title would pass to the State upon approval of a survey, subject now to the contingency that any part or all of the three sections 16 now in dispute might become a part of the reservation when its boundaries were finally defined.

In 1856 the Surveyor General accepted a survey of lands which included the three sections 16 now in dispute. I consider that at that moment fee simple title passed from the United States to the State, subject to the contingency that any part or all of the three sections 16 might become a part of the reservation when its boundaries were finally defined.

In 1859, the boundaries of the reservation were defined so as to include the three sections 16 now in dispute. I consider that at that moment fee simple title remained in the State, but subject to the major encumbrance consisting of the rights to be enjoyed by the Lac Courte Oreilles Band, as contemplated in the 1854 treaty, in the lands included in the reservation.

In 1873, a change in the boundaries of the reservation was agreed upon, and its boundaries assumed a final form. The disputed sections 16 were then not included within the reservation. I conclude that at that moment the fee simple title of the State was freed of any and all interests theretofore enjoyed by the Chippewa, and also freed of any and all interests theretofore enjoyed by the United States either in its own right or in any kind of fiduciary role it may ever have performed for the benefit of the Chippewa.

Plaintiff disputes the correctness of the analysis just stated, contending that at the crucial moment in 1856 when the Surveyor General accepted the survey and when title to the three sections 16 might otherwise have passed to the State, they had been "otherwise disposed of," within the meaning of the 1846 enabling Act; that no interest, whether encumbered or unencumbered, passed to the State at that time; and that no interest in the State could "spring" thereafter by reason of subsequent events.

■ I cannot accept such a construction of the term "or otherwise disposed of," as used in the 1846 Act. Although not framed in precisely this way, the substance of this issue was specifically reserved in *United States v. Morrison,* 240 U.S. 192, 213, 36 S.Ct. 326, 334, 60 L.Ed. 599 (1916):

> . . . It is also argued that the State . . . has the right to await the 'extinguishment' of the 'reservation' and the 'restoration of the lands therein embraced to the public domain,' and then to take the described [school] sections. We are not called upon to consider any such question here, and we express no opinion upon it, as there has been no extinguishment of the reservation . . . .

In *Beecher v. Wetherby,* 95 U.S. 517, 24 L.Ed. 440 (1877), however, the Court suggests the analysis which I have now adopted, namely, that in 1856 the State acquired the fee to the sections 16 at issue, subject to certain Indian interests and subject to certain contingencies with respect to the future modification of those Indian interests, and that when those encumbrances were terminated, the State's title became unencumbered. In *Beecher,* the issue centered on title to a section 16 which had been occupied by the Menominee Indians in Wisconsin. The court cited with approval (95 U.S. at 526) the holding in *United States v. Cook,* 19 Wall. (85 U.S.) 591, 22 L.Ed. 210 (1873): "[T]he right of the Indians to their occupancy is as sacred as that of the United States to the fee, but it is only a right of occupancy. The possession, when abandoned by the Indians, attaches itself to the fee without further grant." The Court then held (95 U.S. at 526):

In the present case, there can hardly be a doubt that Congress intended to vest in the State the fee to section 16 in every township, subject, it is true, as in all other cases of grants of public lands, to the existing occupancy of the Indians so long as that occupancy should continue. The greater part of the State was, at the date of the compact, occupied by different tribes, and the grant of sections in other portions would have been comparatively of little value. Congress undoubtedly expected that at no distant day the State would be settled by white people, and the semi-barbarous condition of the Indian tribes would give place to the higher civilization of our race; and it contemplated by its benefactions to carry out in that State, as in other States, "its ancient and honored policy" of devoting the central section in every township for the education of the people.

The *Beecher* case is cited with approval in *Thomas,* 151 U.S., at 583, 14 S.Ct. at 428, where the Court also cited with approval the opinion of Mr. Justice Lamar, written while he was Secretary of the Interior:

That where the fee is in the United States at the date of survey, and the land is so incumbered that full and complete title and right of possession cannot then vest in the state, the state may, if it so desires, elect to take equivalent lands in fulfillment of the compact, or it may wait until the right and title of possession unite in the government, and then satisfy its grant by taking the lands specifically granted.

Plaintiff contends that a similar theory has been rejected by the Board of Land Appeals of the Department of the Interior in a decision entered November 24, 1972. There the Board rejected California's claim to swamplands which had not been swamplands at the date of enactment of the Swamp and Overflowed Lands Act of September 28, 1850. The Board held that unless the lands had been swamplands at the date of the Act, they could not fall within the Act's provisions. I consider the statutory and historical context of the swampland

controversy too remote and different to shed light on the present controversy.

### Estoppel of State

 Lastly, plaintiff contends that by virtue of the State's failure to appeal decisions by the Commissioner of the General Land Office, dated November 13, 1941, and February 19, 1942, denying the State's application for a patent to those lands, the State is estopped from claiming title to the sections 16 at issue. Plaintiff has not produced those administrative decisions and I cannot determine their significance. Even assuming their direct relevance, however, plaintiff has not shown the presence of other essential elements of equitable estoppel, such as whether plaintiff reasonably understood the State's failure to appeal the decision as a disclaimer of title to the lands, and whether plaintiff relied upon the implied disclaimer to its detriment. *See Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir. 1970), and *Minerals & Chemicals Phillip Corp. v. Milwhite Co.,* 414 F.2d 428 (5th Cir. 1969). I hold that the State is not estopped in this action from asserting its title.

Upon the basis of the entire record, I hold that fee simple title to the sections 16 in dispute is vested in the State of Wisconsin and those claiming interests through the State, and that neither the United States nor the Lac Courte Oreilles Band enjoys any interest in said sections 16 except for any interest which may have been obtained subsequent to 1873 through the State or its successors in interest. An order to this effect is being entered at the foot of the consolidated opinion in these three cases.

Lac Courte Oreilles Band of Lake Superior Chippewa Indians, et al. v. Lester P. Voigt, et al., 74–C–313

This is a civil action in which plaintiffs contend that the members of the Lac Courte Oreilles Band of the Lake Superior Tribe of Chippewa Indians have a right, pursuant to the 1837 and 1842 treaties between the Chippewa and the United States, to hunt, fish and gather wild rice without state regulation or control in the area ceded by the Indians in those treaties. Plaintiffs seek: a declaratory judgment that Wis. Stat. § 29.09(1), which requires hunting, trapping and fishing licenses of all persons, including Indians off reservation lands, is unconstitutional in that it conflicts with the 1837 and 1842 treaties, the Federal Constitution, and a federal law; and an injunction against further enforcement of Wis.Stat. § 29.09(1) and other state fish and game laws against plaintiffs. Jurisdiction is present. 28 U.S.C. § 1362.

Plaintiffs are the Lac Courte Oreilles Band, suing in behalf of itself and its members; a member of the band who is being prosecuted for exercising his alleged treaty rights; and a member of the Band who is being threatened with prosecution for exercising his alleged treaty rights. Defendants are the Secretary of the Wisconsin Department of Natural Resources who is responsible for the enforcement of state fish and game laws, and state and county officials who are charged with the duty of enforcing and prosecuting state fish and game laws.[18]

The case is currently before the court on cross motions for summary judgment. Upon the basis of the entire record herein, I find that there is no genuine issue as to the material facts set forth above, under the heading "Facts," nor the material facts set forth below:

### Facts

The Lac Courte Oreilles Band is a band of Chippewa Indians established in accordance

**18.** In the amended complaint, the individual plaintiffs allege that they are suing on behalf of a class consisting of all members of the Band who are being prosecuted or who are threatened with prosecution "for exercising their hunting, fishing, and ricing rights pursuant to Article 5 of the Treaty of 1837 and Article 2 of the Treaty of 1842." Defendants are also sued as representatives of classes. Although defendants have admitted all of the class allegations of the complaint, a class action has not as yet been certified pursuant to Federal Rules of Civil Procedure 23(c). Because of the broad, equitable nature of the relief sought, I do not think certification of a class is necessary in this litigation. Therefore, I will not address the propriety of class certification at this time.

with § 16 of the Indian Reorganization Act of 1934, with a governing body recognized by the Secretary of the Interior.

At the time the amended complaint was filed, plaintiff Frederick Tribble, an enrolled member of the Lac Courte Oreilles Band, was being prosecuted for hunting, fishing and ricing activities.

For a number of years, the defendants and their predecessors have been prosecuting members of the Lac Courte Oreilles Band and confiscating their property for violations of Wisconsin fish and game laws committed within the exterior boundaries of the territory ceded by the Treaties of 1837 and 1842, but outside the boundaries of any federally recognized Indian reservation.

At the time the amended complaint was filed, state prosecutions of Melvin White, Thomas Ford and Roger Diamond, all enrolled members of the Lac Courte Oreilles Band, were pending. These prosecutions were for violations of Wisconsin statutes, for activities which plaintiffs claim were within their 1837 and 1842 treaty rights.

### OPINION

Plaintiffs contend that when the Chippewa Indians ceded their lands in northern Wisconsin to the United States by treaties in 1837 and 1842, they were granted the right to hunt, fish, trap and gather wild rice and maple sap (hereinafter collectively referred to, for brevity's sake, as hunting rights) on those lands. They contend that those rights have never been abrogated and continue in effect today. Plaintiffs further allege that pursuant to the provisions of 18 U.S.C. § 1162(b), the State cannot interfere with their treaty hunting rights by regulating those activities or requiring plaintiffs to have licenses to engage in them. Section 1162 gives the states jurisdiction over certain offenses committed in Indian country, but subsection (b) specifically exempts treaty hunting rights:

> (b) Nothing in this section shall . . . deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

No issue exists as to the Indians' right today to hunt off the reservation on the same basis on which non-Indians are permitted to hunt. In the ensuing discussion, references to the Indians' "hunting rights," and similar wording, are to be read as references to a special right to hunt free of the restrictions placed upon others by state law.

Defendants concede that the Chippewa were given hunting rights by the treaties of 1837 and 1842. They further concede that if those rights have not been abrogated, the State lacks any authority over Indian hunting activities. But defendants contend that the Indians' treaty hunting rights were extinguished by the President's 1850 order of removal and by the 1854 treaty between the Chippewa and the United States. The single issue to be determined on this motion for summary judgment, therefore, is whether the Indians' 1837 and 1842 treaty hunting rights have been abrogated.

Article 5 of the 1837 treaty between the Chippewa and the United States guaranteed the Indians "[t]he privilege of hunting, fishing and gathering wild rice," on ceded lands. Article 2 of the 1842 treaty between the Chippewa and the United States guaranteed the Indians "the right of hunting on the ceded territory, with the other usual privileges of occupancy." While the words of the treaties are different, they have both been construed, correctly I think, to grant the Indians the right to live on the ceded lands as they had lived before the treaties were signed. That way of life included hunting, fishing, trapping and gathering wild rice and maple sap as a means of providing food for themselves (to all of which activities I will continue to refer as "hunting"), in addition to having a place of residence. *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 406, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968).

Thus, the disputed hunting rights at issue in this case are based upon the same treaty language as the right of permissive occupation at issue in *United States v. Ben Ruby, supra.* For the reasons I have set forth in

*Ben Ruby,* I hold that the President's removal order of 1850 was not authorized by either the treaty of 1837 or the treaty of 1842; and that the removal order was thus beyond the scope of the President's powers and without legal effect. Additionally, as I held in *Ben Ruby,* any forcible removal of the Chippewa which may have taken place pursuant to that order is also without legal effect.

Also, I have held in *Ben Ruby* that the Indians' right of permissive occupation promised by the 1837 and 1842 treaties was extinguished by the provisions of the 1854 treaty as to lands outside the reservations, when the boundaries of the reservation were finally determined. It would not be entirely unreasonable to treat the concept of "permissive occupation" as embodying two distinct elements: the right to establish permanent homes in the area; and the right to hunt in the area. It would be open to argument that the 1854 treaty abrogated the former but not the latter. But I conclude that such a distinction is not valid.

As I pointed out in *Ben Ruby,* the 1854 treaty was a compromise of a vigorous dispute between the United States and the Chippewa about the Indians' rights on the ceded lands. The United States wanted to prepare the way for white settlement, and the Indians understood that purpose. The Indians wanted to remain permanently on lands in the vicinity of the lands where they then resided, and they were willing to accept relatively small reservations in exchange for that right. Chief Buffalo's statement at the treaty negotiations that the Indians now understood that the "whole" of their non-reservation lands would go to the United States indicates the Indian understanding that they were relinquishing any general claims they might have had to lands outside their reservations.

Additionally, as I also pointed out in *Ben Ruby,* Article 11 of the 1854 treaty expressly reserved the right of the Chippewa residing in a Minnesota territory to hunt and fish; and in the 1837 and 1842 treaties the parties had expressly preserved the Indians' hunting rights in the territories then ceded. Had the parties intended the 1854 treaty to continue to preserve those rights in the lands ceded in 1837 and 1842, it is reasonable to believe that they would have made it explicit in 1854.

Finally, this interpretation of the treaty is supported by *United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941) in which the court held that an Indian tribe's acceptance of a reservation, after years of tension between Indians and white settlers and after numerous attempts by the federal government to solve the problem by establishing a reservation, must be construed as Indian relinquishment of all tribal rights in non-reservation lands.

The evidence indicates that the Indians continued to roam throughout northern Wisconsin and parts of Minnesota in pursuit of food after the 1854 treaty, until the 1890's. I take judicial notice that most of the lands in northern Wisconsin were sparsely populated and publicly owned in 1854, and were only gradually populated and developed during the next half-century. Hunting and fishing on public and undeveloped land was part of the frontier way of life for Indians and white people alike. Thus, the Indians' practice of roaming on non-reservation lands is not persuasive evidence that they were exercising special treaty hunting rights.

I am aware of *People v. Jondreau,* 384 Mich. 539, 185 N.W.2d 375 (1971), construing Article 11 of the 1854 treaty as a grant to the L'Anse band of Chippewa in northern Michigan of the right to fish in a bay of Lake Superior adjacent to their reservation. The court based its holding on the apparent assumption that the territory "hereby ceded" by the 1854 treaty included the area held by the Chippewa in northern Michigan. The evidence in this case in this court clearly shows that only lands in Minnesota were ceded in 1854.

I am also aware of *State v. Gurnoe,* 53 Wis.2d 390, 192 N.W.2d 892 (1972), in which the Court held that the 1854 treaty granted the Chippewa the right to fish in Lake Superior. In *Gurnoe,* Indians, who were members of the Red Cliff and Bad River

Bands and who had been arrested in Lake Superior waters adjacent to their reservations, challenged the validity of enforcing state fishing regulations against them. They argued that Article 2 of the 1854 treaty, setting aside their reservations on the shore of Lake Superior "for the use of" the bands was a grant of fishing rights in Lake Superior.

The court first examined the 1854 treaty to determine whether, in the phrase "for the use of," the parties had intended generally to exclude all fishing rights. Turning to the history of the tribe and the negotiations of the parties, it found that the Chippewa had a long, uninterrupted history of fishing in Lake Superior, that that right was extremely valuable to the Indians, and that they had continued to fish in the lake after the treaty was negotiated. It concluded that there was "no doubt but that it was the intention of the parties to the treaty for the Chippewa to retain fishing rights within the 1854 agreement." *Id.* at 405, 192 N.W.2d at 899.

Secondly, the court considered whether the fishing rights granted in 1854 extended beyond reservation boundaries to Lake Superior. The court again emphasized the importance of Lake Superior fishing to the Chippewa and concluded: "We find no valid distinction and none is asserted for holding that the Indians may fish in reservation waters but not on the waters of Lake Superior, their traditional fishing ground." *Id.* at 408, 192 N.W.2d at 901. In reaching that conclusion the *Gurnoe* court again looked to the intent of the treating parties, finding, as the court had in *Jondreau*, that the Indians " 'would assume that the right to fish meant the right to fish [in Lake Superior].' " *Id.* 384 Mich. at 409, 192 N.W.2d at 901. Additionally, the court relied upon the holding in *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918) that a reservation consisting of certain islands included adjacent fishing grounds. In *Alaska Pacific Fisheries*, the court had held that the use of the adjacent fishing grounds was essential to the Indians' sustenance, and that the Indians had proceeded on the theory that the fishing grounds were part of the islands when they solicited that location for a reservation. In *Gurnoe*, the court found that the same circumstances were present. The court concluded:

Whether the right to fish in Lake Superior is denominated "off-reservation rights" or interpreted to be inherent rights under the treaty, the result is the same—the Chippewa are entitled to the right to fish Lake Superior.

I do not disagree with the result in *Gurnoe*. But although the *Gurnoe* holding is based upon the same treaty and raises an issue which initially appears similar to the issue raised in the present case, the cases are quite distinct.

I must decide, as the court did in *Gurnoe*, what the intentions of the treating parties were about the rights asserted. As the court explained in *Gurnoe*, there is considerable reason to believe that the parties intended that the Chippewa Bands whose reservations bordered on Lake Superior would have fishing rights in Lake Superior. Besides the Indians' long history of fishing in Lake Superior, the evidence in this case in this court indicates that several reservations were located upon the shore of Lake Superior precisely for the purpose of giving the Indians access to the lake for fishing. When a reservation is established "for the use of" an Indian Band and it is located so as to give that Band access to a specific adjacent resource, it is logical and reasonable to infer that the parties intended to make the use of the adjacent off-reservation resource a part of the Indians' treaty rights.

In the present case, the Indians are not claiming a right to fish in a particular body of water adjacent to their reservation, or to hunt and gather maple sap in a forest bordering on their reservation. If they had made such a claim, showing some evidence that the reservation was located so as to give them access to a particular body of water or to a particular forest, *Gurnoe* would be apposite.

Here the Indians claim a more general hunting right to vast areas of land, and they base the claim not upon the 1854 treaty but upon the 1837 and 1842 treaties,

which, they assert, have not been abrogated. Thus, their claim is not based upon an inference from the language in the 1854 treaty reserving relatively small tracts "for the use of" the Indian Bands.

Had such a claim been asserted in this case, it could not have prevailed. The inference which was reasonable in *Gurnoe* with respect to Lake Superior, and which conceivably might be reasonable with respect to some specific body of water or forest adjacent to the Lac Courte Oreilles reservation, is not appropriate to a claim to special hunting rights throughout the entire territory ceded in 1837 and 1842. To the contrary, as I have explained in *Ben Ruby* and reiterated briefly in this opinion, the evidence strongly implies the parties' intention that the 1854 treaty would extinguish the general Indian claim of a right to occupy, and hunt, fish and otherwise obtain food on the earlier ceded lands. That general intention is not inconsistent with the specific intention the *Gurnoe* court inferred from the 1854 treaty to allow Indians special hunting and fishing rights on certain limited parts of the ceded territory adjacent to their reservations when it appears that the reservations were located so as to give the Indians access to the adjacent resource. Therefore my holding is not inconsistent with the result in *Gurnoe*.[19]

Accordingly, I hold that when the boundaries of the Lac Courte Oreilles reservation were finally determined pursuant to the 1854 treaty, the general right of the Lac Courte Oreilles Band and its individual members to hunt, fish and gather wild rice and maple sap in the area ceded by the Chippewa to the United States by the treaties of 1837 and 1842, free of regulation by state government, was extinguished, except as to reservation lands, and except as to special hunting and fishing rights on limited parts of the ceded territory adjacent to the treaty reservations which might properly be inferred from the language of the 1854 treaty setting apart the reservations "for the use of" the Chippewa.

Because the plaintiffs have made no claims to any such particularized treaty hunting rights, but have argued only that the more general right granted by the 1837 and 1842 treaties has not been abrogated, their contention in this lawsuit must fail.

## APPENDIX A

This Appendix A consists of two maps which appear in the Eighteenth Annual Report of the Bureau of American Ethnology to the Secretary of the Smithsonian Institution, 1896–97, by J. W. Powell, Director, Part 2, Plate CXL, No. 33 in List of Maps, and Plate CLXXI, No. 64 in List of Maps (House of Representatives, 56th Congress, 1st Session, Document No. 736, Washington, Government Printing Office, 1899).

Lines have been added to the maps to show the boundaries of the territories ceded by the Treaties of 1837, 1842 and 1854.

19. Although the defendants in *Gurnoe* were members of the Red Cliff and Bad River Bands and lived on reservations bordering on Lake Superior, the court did not limit its holding to the members of those Bands, but held generally that the Chippewa have a right to fish Lake Superior. The Lac Courte Oreilles reservation is about 50 miles inland. But there is no contention here that the defendants threaten to interfere with fishing by the Lac Courte Oreilles Band in Lake Superior, and thus no basis for injunctive relief in that respect. I find it unnecessary to explore the existence or nature of the Lac Courte Oreilles Indians' right to fish in Lake Superior pursuant to the *Gurnoe* decision.

**1362**

WISCONSIN 1
SCALE 35 MILES TO 1 INCH

EIGHTEENTH ANNUAL REPORT. PL. CXL

**MINNESOTA 1**
SCALE 35 MILLS TO 1 INCH

## APPENDIX B

This Appendix B consists of the Treaties of 1837, 1842, and 1854. The Treaty of 1837 is to be found in 7 United States Statutes at Large (Indian Treaties) 536. The Treaty of 1842 is to be found in 7 United States Statutes at Large (Indian Treaties) 591. The Treaty of 1854 is to be found in 10 United States Statutes at Large, 1109.

## ARTICLES OF A TREATY

July 29, 1837.
Proclamation,
June 15, 1838.

*Made and concluded at St. Peters (the confluence of the St. Peters and Mississippi rivers) in the Territory of Wisconsin, between the United States of America, by their commissioner, Henry Dodge, Governor of said Territory, and the Chippewa nation of Indians, by their chiefs and headmen.*

Land ceded to the U.S.

ARTICLE 1. The said Chippewa nation cede to the United States all that tract of country included within the following boundaries:

Boundaries.

Beginning at the junction of the Crow Wing and Mississippi rivers, between twenty and thirty miles above where the M'-sissippi is crossed by the forty-sixth parallel of north latitude, and running thence to the north point of Lake St. Croix, one of the sources of the St. Croix river; thence to and along the dividing ridge between the waters of Lake Superior and those of the Mississippi, to the sources of the Ocha-sua-sepe a tributary of the Chippewa river; thence to a point on the Chippewa river, twenty miles below the outlet of Lake De Flambeau; thence to the junction of the Wisconsin and Pelican rivers; thence on an east course twenty-five miles; thence southerly, on a course parallel with that of the Wisconsin river, to the line dividing the territories of the Chippewas and Menomonies; thence to the Plover Portage; thence along the southern boundary of the Chippewa country, to the commence-ment of the boundary line dividing it from that of the Sioux, half a days march below the falls on the Chippewa river; thence with said boundary line to the mouth of Wah-tap river, at its junction with the Mississippi; and thence up the Mississippi to the place of beginning.

U.S. to make the following payments annually for twenty years.

ARTICLE 2. In consideration of the cession aforesaid, the United States agree to make to the Chippewa nation, annually, for the term of twenty years, from the date of the ratification of this treaty, the following payments.

1. Nine thousand five hundred dollars, to be paid in money.

2. Nineteen thousand dollars, to be delivered in goods.

3. Three thousand dollars for establishing three blacksmiths shops, supporting the blacksmiths, and furnishing them with iron and steel.

4. One thousand dollars for farmers, and for supplying them and the Indians, with implements of labor, with grain or seed; and whatever else may be necessary to enable them to carry on their agricultural pursuits.

5. Two thousand dollars in provisions.

6. Five hundred dollars in tobacco.

The provisions and tobacco to be delivered at the same time with the goods, and the money to be paid; which time or times, as well as the place or places where they are to be delivered, shall be fixed upon under the direction of the President of the United States.

The blacksmiths shops to be placed at such points in the Chippewa country as shall be designated by the Superintendent of Indian Affairs, or under his direction.

If at the expiration of one or more years the Indians should prefer to receive goods, instead of the nine thousand dollars agreed to be paid to them in money, they shall be at liberty to do so. Or, should they conclude to appropriate a portion of that annuity to the establishment and support of a school or schools among them, this shall be granted them.

ARTICLE 3. The sum of one hundred thousand dollars shall be paid by the United States, to the half-breeds of the Chippewa nation, under the direction of the President. It is the wish of the Indians that their two sub-agents Daniel P. Bushnell, and Miles M. Vineyard, superintend the distribution of this money among their half-breed relations. *Payment to half-breeds.*

ARTICLE 4. The sum of seventy thousand dollars shall be applied to the payment, by the United States, of certain claims against the Indians; of which amount twenty-eight thousand dollars shall, at their request, be paid to William A. Aitkin, twenty-five thousand to Lyman M. Warren, and the ballance applied to the liquidation of other just demands against them—which they acknowledge to be the case with regard to that presented by Hercules L. Dousman, for the sum of five thousand dollars; and they request that it be paid. *Payment of claims against Indians.*

ARTICLE 5. The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States. *Hunting ground.*

ARTICLE 6. This treaty shall be obligatory from and after its ratification by the President and Senate of the United States. *Treaty binding when ratified.*

Done at St. Peters in the Territory of Wisconsin the twenty-ninth day of July eighteen hundred and thirty-seven.

(Signed) HENRY DODGE, *Com'r.*

*From Leech lake.*

*Chiefs.*
Aish-ke-bo-ge-koshe, or Flat Mouth,
R-che-o-sau-ya, or the Elder Brother.

*Warriors.*
Pe-zhe-kins, the Young Buffalo,

Ma-ghe-ga-bo, or La Trappe,
O-be-gwa-dans, the Chief of the Earth,
Wa-bose, or the Rabbit,
Che-a-na-quod, or the Big Cloud.

*From Gull lake and Swan river.*

*Chiefs.*
Pa-goo-na-kee-zhig, or the Hole in the Day,
Songa-ko-mig, or the Strong Ground.

*Warriors.*
Wa-boo-jig, or the White Fisher,
Ma-cou-da, or the Bear's Heart.

*From St. Croix river.*

| Chiefs. | Warriors. |
|---|---|
| Pe-zhe-ke, or the Buffalo, | Pa-ga-we-we-wetung, Coming Home Hollowing, |
| Ka-be-ma-be, or the Wet Month. | Ya-banse, or the Young Buck, |
| | Kis-ke-ta-wak, or the Cut Ear. |

*From Lake Courteoville.*

Chiefs.

Pa-qua-a-mo, or the Wood Pecker.

*From Lac De Flambeau.*

| Chiefs. | |
|---|---|
| Pish-ka-ga-ghe, or the White Crow, | O-ge-ma-ga, or the Dandy, |
| Na-wa-ge-wa, or the Knee, | Pa-se-quam-jis, or the Commissioner, |
| | Wa-be-ne-me, or the White Thunder. |

68

*From La Pointe, (on Lake Superior.)*

| Chiefs. | |
|---|---|
| Pe-zhe-ke, or the Buffalo, | Ta-qua-ga-na, or Two Lodges Meeting, |
| | Cha-che-que-o. |

*From Mille Lac.*

| Chiefs. | Warriors. |
|---|---|
| Wa-shask-ko-kone, or Rats Liver. | Ada-we-ge-shik, or Both Ends of the Sky, |
| Wen-ghe-ge-she-guk, or the First Day. | Ka-ka-quap, or the Sparrow. |

*From Sandy Lake.*

| Chiefs. | Warriors. |
|---|---|
| Ka-nan-da-wa-win-zo, or Le Brocheux, | Na-ta-me-ga-bo, the Man that stands First, |
| We-we-shan-shis, the Bad Boy, or Big Mouth, | Sa-ga-ta-gun, or Spunk. |
| Ke-che-wa-me-te-go, or the Big Frenchman. | |

*From Snake river.*

| Chiefs. | Warriors. |
|---|---|
| Naudin, or the Wind, | Ha-tau-wa, |
| Sha-go-bai, or the Little Six, | Wa-me-te-go-zhins, the Little Frenchman, |
| Pay-a-jik, or the Lone Man, | Sho-ne-a, or Silver. |
| Na-qua-na-bie, or the Feather. | |

*From Fond du Lac, (on Lake Superior.)*

| Chiefs. | |
|---|---|
| Mang-go-sit, or the Loons Foot, | Shing-go-be, or the Spruce. |

*From Red Cedar lake.*

Mont-so-mo, or the Murdering Yell.

*From Red lake.*

Francois Goumean (a half breed.)

*From Leech lake.*

| Warriors. | |
|---|---|
| Sha-wa-ghe-zhig, or the Sounding Sky, | Wa-zau-ko-ni-a, or Yellow Robe. |

Signed in presence of Verplanck Van Antwerp, Sec'y. to the Commissioner. M. M. Vineyard, U. S. Sub-Ind. Agt. Daniel P. Bushnell. Law. Taliaferro, Ind. Agent at St. Peters. Martin Scott, Capt. 5th Reg't. Inf'ty. J. Emerson, Ass't. Surg. U. S. Army. H. H. Sibley. H. L. Dousman. S. C. Stambaugh. E. Lockwood. Lyman M. Warren. J. N. Nicollet. Harmen Van Antwerp. Wm. H. Forbes. Jean Baptiste Dubay, Interpreter. Peter Quinn, Interpreter. S. Campbell, U. S. Interpreter. Stephen Bonga, Interpreter. Wm. W. Coriell.

To the Indian names are subjoined a mark and seal.

## ARTICLES OF A TREATY

*Made and concluded at La Pointe of Lake Superior, in the Territory of Wisconsin, between Robert Stuart commissioner on the part of the United States, and the Chippewa Indians of the Mississippi, and Lake Superior, by their chiefs and headmen.*

Oct. 4, 1842.
Proclamation,
March 23, 1843.

### ARTICLE I.

THE Chippewa Indians of the Mississippi and Lake Superior, cede to the United States all the country within the following boundaries; viz: beginning at the mouth of Chocolate river of Lake Superior; thence northwardly across said lake to intersect the boundery line between the United States and the Province of Canada; thence up said Lake Superior, to the mouth of the St. Louis, or Fond du Lac river (including all the islands in said lake); thence up said river to the American Fur Company's trading post, at the southwardly bend thereof, about 22 miles from its mouth; thence south to intersect the line of the treaty of 29th July 1837, with the Chippewas of the Mississippi; thence along said line to its southeastwardly extremity, near the Plover portage on the Wisconsin river; thence northeastwardly, along the boundery line, between the Chippewas and Menomonees, to its eastern termination, (established by the treaty held with the Chippewas, Menomonees, and Winnebagoes, at Butte des Morts, August 11th 1827) on the Skonawby river of Green Bay; thence northwardly to the source of Chocolate river; thence down said river to its mouth, the place of beginning; it being the intention of the parties to this treaty, to include in this cession, all the Chippewa lands eastwardly of the aforesaid line running from the American Fur Company's trading post on the Fond du Lac river to the intersection of the line of the treaty made with the Chippewas of the Mississippi July 29th 1837.

Land ceded to the U.S.

Ante, p. 536.

Ante, p. 303.

Ante, p. 536.

### ARTICLE II.

The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.

Hunting ground.

### ARTICLE III.

It is agreed by the parties to this treaty, that whenever the Indians shall be required to remove from the ceded district, all the unceded lands belonging to the Indians of Fond du Lac, Sandy Lake, and Mississippi bands, shall be the common property and home of all the Indians, party to this treaty.

Unceded lands to be common property of the Indians.

### ARTICLE IV.

In consideration of the foregoing cession, the United States, engage to pay to the Chippewa Indians of the Mississippi, and Lake Superior, annually, for twenty-five years, twelve thousand five hundred (12,500) dollars, in specie, ten thousand five hundred (10,500) dollars in goods, two thousand (2,000) dollars in provisions and tobacco, two thousand (2,000) dollars for the support of two blacksmiths shops, (including pay

Sums to be paid by U.S. for cession.

of smiths and assistants, and iron steel &c.) one thousand (1,000) dollars for pay of two farmers, twelve hundred (1,200) for pay of two carpenters, and two thousand (2,000) dollars for the support of schools for the Indians party to this treaty; and further the United States engage to pay the sum of five thousand (5,000) dollars as an agricultural fund, to be expended under the direction of the Secretary of War. And

**Indian debts to be paid by U.S.** also the sum of seventy-five thousand (75,000) dollars, shall be allowed for the full satisfaction of their debts within the ceded district, which shall be examined by the commissioner to this treaty, and the amount to be allowed decided upon by him, which shall appear in a schedule hereunto annexed. The United States shall pay the amount so allowed within three years.

**Provision for half-breeds.** Whereas the Indians have expressed a strong desire to have some provision made for their half breed relatives, therefore it is agreed, that fifteen thousand (15,000) dollars shall be paid to said Indians, next year, as a present, to be disposed of, as they, together with their agent, shall determine in council.

## ARTICLE V.

**Division of annuity.** Whereas the whole country between Lake Superior and the Mississippi, has always been understood as belonging in common to the Chippewas, party to this treaty; and whereas the bands bordering on Lake Superior, have not been allowed to participate in the annuity payments of the treaty made with the Chippewas of the Mississippi, at St. Peters

**Ante, p. 536.** July 29th 1837, and whereas all the unceded lands belonging to the aforesaid Indians, are hereafter to be held in common, therefore, to remove all occasion for jealousy and discontent, it is agreed that all the annuity due by the said treaty, as also the annuity due by the present treaty, shall henceforth be equally divided among the Chippewas of the Mississippi and Lake Superior, party to this treaty, so that every person shall receive an equal share.

**Indians on mineral districts subject to removal.**

## ARTICLE VI.

The Indians residing on the Mineral district, shall be subject to removal therefrom at the pleasure of the President of the United States

## ARTICLE VII.

**Obligatory when ratified.** This treaty shall be obligatory upon the contracting parties, when ratified by the President and Senate of the United States.

In testimony whereof, the said Robert Stuart commissioner, on the part of the United States, and the chiefs and headmen of the Chippewa Indians of the Mississippi and Lake Superior, have hereunto set their hands, at La Pointe of Lake Superior, Wisconsin Territory this fourth day of October in the year of our Lord one thousand eight hundred and forty-two.

ROBERT STUART, *Commissioner.*
JNO. HULBERT, *Secretary.*

| | | | |
|---|---|---|---|
| Crow-wing River, | Po go ne gi shik, | 1st | chief, |
| Do. | Son go com ick, | 2d | do. |
| Sandy Lake, | Ka non do ur uin zo, | 1st | do. |
| Do. | Na tum e gaw bon, | 2d | do. |
| Gull Lake, | Ua bo jig, | 1st | do. |
| Do. | Pay pe si gon de bay, | 2d | do. |
| Red Ceder Lake, | Kui ui sen shis, | 1st | do. |
| Do. | Ott taw wance, | 2d | do. |
| Po ke gom maw, | Bai ie jig, | 1st | do. |
| Do. | Show ne aw, | 2d | do. |
| Wisconsin River, | Ki uen zi, | 1st | do. |
| Do. | Wi aw bis ke kut te way, | 2d | do. |
| Lac de Flambeau, | A pish ka go gi, | 1st | do. |
| Do. | May tock cus e quay, | 2d | do. |
| Do. | She maw gon e, | 2d | do. |
| Lake Bands, | Ki ji ua be she shi, | 1st | do. |
| Do. | Ke kon o tum, | 2d | do. |
| Fond du Lac, | Shin goob, | 1st | do. |
| Do. | Na gan nab, | 2d | do. |
| Do. | Mong o zet, | 2d | do. |
| La Pointe, | Gitchi waisky, | 1st | do. |
| Do. | Mi zi, | 2d | do. |
| Do. | Ta qua gone e, | 2d | do. |
| Onlonagan, | O kon di kan, | 1st | do. |
| Do. | Kis ke taw wac, | 2d | do. |
| Ance, | Pe na shi, | 1st | do. |
| Do. | Guck we san sish, | 2d | do. |
| Vieux Desert, | Ka she osh e, | 1st | do. |
| Do. | Medge waw gwaw wot, | 2d | do. |
| Mille Lac, | Ne qua ne be, | 1st | do. |
| Do. | Ua shash ko kum, | 2d | do. |
| Do. | No din, | 2d | do. |
| St. Croix, | Be zhi ki, | 1st | do. |
| Do. | Ka bi na be, | 2d | do. |
| Do. | Ai aw bens, | 2d | do. |
| Snake River, | Sha go bi, | 1st | do. |
| Chippewa River, | Ua be she shi, | 1st | do. |
| | Que way zban sis, | 2d | do. |
| Lac Courtulle, | Ne na nang eb, | 1st | do. |
| Do. | Be bo kon uen, | 2d | do. |
| Do. | Ki eun zi, | 2d | do. |

In presence of Henry Blatchford, Interpreter. Samuel Ashmun, Interpreter. Justin Rice. Charles H. Oakes. William A. Aitkin. William Brewster. Charles M. Borup. Z. Platt. C. H. Beaulieu. L. T. Jamison. James P. Scott. Cyrus Mendenhall. L. M. Warren.

**1370**

FRANKLIN PIERCE,

Sept. 30, 1854.

PRESIDENT OF THE UNITED STATES OF AMERICA:

TO ALL AND SINGULAR TO WHOM THESE PRESENTS SHALL COME, GREETING:

WHEREAS a treaty was made and concluded at La Pointe, in the State of Wisconsin, on the thirtieth day of September, eighteen hundred and fifty-four, by Henry C. Gilbert and David B. Herriman, commissioners on the part of the United States, and the Chippewa Indians of Lake Superior and the Mississippi, by their chiefs and headmen, which treaty is in the words following, to wit:—

Articles of a treaty made and concluded at La Pointe, in the State of Wisconsin, between Henry C. Gilbert and David B. Herriman, commissioners on the part of the United States, and the Chippewa Indians of Lake Superior and the Mississippi, by their chiefs and headmen.

Cession to the United States by Chippewas of Lake Superior.

ARTICLE 1. The Chippewas of Lake Superior hereby cede to the United States, all the lands heretofore owned by them in common with the Chippewas of the Mississippi, lying east of the following boundary line, to wit: Beginning at a point, where the east branch of Snake River crosses the southern boundary line of the Chippewa country, running thence up the said branch to its source, thence nearly north, in a straight line, to the mouth of East Savannah River, thence up the St. Louis River to the mouth of East Swan River, thence up the East Swan River to its source, thence in a straight line to the most westerly bend of Vermillion River, and thence down the Vermillion River to its mouth.

Relinquishment to Chippewas of Mississippi by Chippewas of Lake Superior.

The Chippewas of the Mississippi hereby assent and agree to the foregoing cession, and consent that the whole amount of the consideration money for the country ceded above, shall be paid to the Chippewas of Lake Superior, and in consideration thereof the Chippewas of Lake Superior hereby relinquish to the Chippewas of the Mississippi, all their interest in and claim to the lands heretofore owned by them in common, lying west of the above boundary line.

Reservation for Chippewas of Lake Superior.

ARTICLE 2. The United States agree to set apart and withhold from sale, for the use of the Chippewas of Lake Superior, the following described tracts of land, viz:—

1st. For the L'Anse and Vieux De Sert bands, all the unsold lands in the following townships in the State of Michigan: Township fifty one north range thirty-three west; township fifty-one north range thirty-two west; the east half of township fifty north range thirty-three west; the west half of township fifty north range thirty-two west, and all of township fifty-one north range thirty-one west, lying west of Huron Bay.

2d. For the La Pointe band, and such other Indians as may see fit to settle with them, a tract of land bounded as follows: Beginning on the south shore of Lake Superior, a few miles west of Montreal River, at the mouth of a creek called by the Indians Ke-che-se-be-we-she, running thence south to a line drawn east and west through the centre

of township forty-seven north, thence west to the west line of said township, thence south to the southeast corner of township forty-six north, range thirty-two west, thence west the width of two townships, thence north the width of two townships, thence west one mile, thence north to the lake shore, and thence along the lake shore, crossing Shag-waw-me-quon Point, to the place of beginning. Also two hundred acres on the northern extremity of Madeline Island, for a fishing ground.

3d. For the other Wisconsin bands, a tract of land lying about Lac De Flambeau, and another tract on Lac Court Orielles, each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President.

4th. For the Fond Du Lac bands, a tract of land bounded as follows: Beginning at an island in the St. Louis River, above Knife Portage, called by the Indians Paw-paw-sco-me-me-tig, running thence west to the boundary line heretofore described, thence north along said boundary line to the mouth of Savannah River, thence down the St. Louis River, to the place of beginning. And if said tract shall contain less than one hundred thousand acres, a strip of land shall be added on the south side thereof, large enough to equal such deficiency.

5th. For the Grand Portage band, a tract of land bounded as follows: Beginning at a rock, a little east of the eastern extremity of Grand Portage Bay, running thence along the lake shore to the mouth of a small stream called by the Indians Maw-ske-gwaw-caw-maw-se-be, or Cranberry Marsh River, thence up said stream, across the point to Pigeon River, thence down Pigeon River to a point opposite the starting point, and thence across to the place of beginning.

6th. The Ontonagon band and that subdivision of the La Pointe band of which Buffalo is chief, may each select on or near the lake shore, four sections of land, under the direction of the President, the boundaries of which shall be defined hereafter. And being desirous to provide for some of his connections who have rendered his people important services, it is agreed that the chief Buffalo may select one section of land, at such place in the ceded territory as he may see fit, which shall be reserved for that purpose, and conveyed by the United States to such person or persons as he may direct.

7th. Each head of a family or single person over twenty-one years of age at the present time of the mixed bloods, belonging to the Chippewas of Lake Superior, shall be entitled to eighty acres of land, to be selected by them under the direction of the President, and which shall be secured to them by patent in the usual form.

ARTICLE 3. The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such

*Survey and patents of reservation.*

occupants, with such restrictions of the power of alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations, respecting the disposition of the lands in case of the death of the head of a family, or single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts or otherwise, as shall be necessary to prevent interference with any vested rights. All necessary roads, highways, and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, compensation being made therefor as in other cases.

**Payments for said cession.**

ARTICLE 4. In consideration of and payment for the country hereby ceded, the United States agree to pay to the Chippewas of Lake Superior, annually, for the term of twenty years, the following sums, to wit: five thousand dollars in coin; eight thousand dollars in goods, household furniture and cooking utensils; three thousand dollars in agricultural implements and cattle, carpenter's and other tools and building materials, and three thousand dollars for moral and educational purposes, of which last sum, three hundred dollars per annum shall be paid to the Grand Portage band, to enable them to maintain a school at their village. The United States will also pay the further sum of ninety thousand dollars, as the chiefs in open council may direct, to enable them to meet their present just engagements. Also the further sum of six thousand dollars, in agricultural implements, household furniture, and cooking utensils, to be distributed at the next annuity payment, among the mixed bloods of said nation. The United States will also furnish two hundred guns, one hundred rifles, five hundred beaver traps, three hundred dollars' worth of ammunition, and one thousand dollars' worth of ready-made clothing, to be distributed among the young men of the nation, at the next annuity payment.

**Blacksmiths and assistants.**

ARTICLE 5. The United States will also furnish a blacksmith and assistant, with the usual amount of stock, during the continuance of the annuity payments, and as much longer as the President may think proper, at each of the points herein set apart for the residence of the Indians, the same to be in lieu of all the employees to which the Chippewas of Lake Superior may be entitled under previous existing treaties.

**Annuities not to be withheld for debts, but may be for depredations.**

ARTICLE 6. The annuities of the Indians shall not be taken to pay the debts of individuals, but satisfaction for depredations committed by them shall be made by them in such manner as the President may direct.

**Spirituous liquors.**

ARTICLE 7. No spirituous liquors shall be made, sold, or used on any of the lands herein set apart for the residence of the Indians, and the sale of the same shall be prohibited in the territory hereby ceded, until otherwise ordered by the President.

**Division between Chippewas of Mississippi and of Lake Superior of benefits of former treaties.**

ARTICLE 8. It is agreed, between the Chippewas of Lake Superior and the Chippewas of the Mississippi, that the former shall be entitled to two thirds, and the latter to one third, of all benefits to be derived from former treaties existing prior to the year 1847.

**Arrearages.**

ARTICLE 9. The United States agree that an examination shall be made, and all sums that may be found equitably due to the Indians, for

arrearages of annuity or other thing, under the provisions of former treaties, shall be paid as the chiefs may direct.

ARTICLE 10. All missionaries, and teachers, and other persons of full age, residing in the territory hereby ceded, or upon any of the reservations hereby made by authority of law, shall be allowed to enter the land occupied by them at the minimum price whenever the surveys shall be completed to the amount of one quarter section each.

*Preemption.*

ARTICLE 11. All annuity payments to the Chippewas of Lake Superior, shall hereafter be made at L'Anse, La Pointe, Grand Portage, and on the St. Louis River; and the Indians shall not be required to remove from the homes hereby set apart for them. And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President.

*Annuities, how paid.*

ARTICLE 12. In consideration of the poverty of the Bois Forte Indians who are parties to this treaty, they having never received any annuity payments, and of the great extent of that part of the ceded country owned exclusively by them, the following additional stipulations are made for their benefit. The United States will pay the sum of ten thousand dollars, as their chiefs in open council may direct, to enable them to meet their present just engagements. Also the further sum of ten thousand dollars, in five equal annual payments, in blankets, cloth, nets, guns, ammunition, and such other articles of necessity as they may require.

*Stipulations for Bois Forte Indians.*

They shall have the right to select their reservation at any time hereafter, under the direction of the President; and the same may be equal in extent, in proportion to their numbers, to those allowed the other bands, and be subject to the same provisions.

They shall be allowed a blacksmith, and the usual smith-shop supplies, and also two persons to instruct them in farming, whenever in the opinion of the President it shall be proper, and for such length of time as he shall direct.

It is understood, that all Indians who are parties to this treaty, except the Chippewas of the Mississippi, shall hereafter be know as the Chippewas of Lake Superior. Provided, that the stipulation by which the Chippewas of Lake Superior relinquishing their right to land west of the boundary line, shall not apply to the Bois Forte band who are parties to this treaty.

ARTICLE 13. This treaty shall be obligatory on the contracting parties, as soon as the same shall be ratified by the President and Senate of the United States.

In testimony whereof, the said Henry C. Gilbert, and the said David B. Herriman, commissioners as aforesaid, and the undersigned chiefs and headmen of the Chippewas of Lake Superior and the Mississippi, have hereunto set their hands and seals, at the place aforesaid, this thirtieth day of September, one thousand eight hundred and fifty-four.

HENRY C. GILBERT,
DAVID B. HERRIMAN,
*Commissioners.*

RICHARD M. SMITH,
*Secretary.*

*La Pointe Band.*

| | |
|---|---|
| KE–CHE–WAISH–KE, or the Buffalo, 1st chief, | his x mark. [L. S.] |
| CHAY–CHE–QUE–OH, 2d chief, | his x mark. [L. S.] |
| A–DAW–WE–GE–ZHICK, or Each Side of the sky, 2d chief, | his x mark. [L. S.] |
| O–SKE–NAW–WAY, or the Youth, 2d chief, | his x mark. [L. S.] |
| MAW–CAW–DAY–PE–NAY–SE, or the Black Bird, 2d chief, | his x mark. [L. S.] |
| NAW–WAW–NAW–QUOT, headman, | his x mark. [L. S.] |
| KE–WAIN–ZEENCE, headman, | his x mark. [L. S.] |
| WAW–BAW–NE–ME–KE, or the White Thunder, 2d chief, | his x mark. [L. S.] |
| PAY–BAW–ME–SAY, or the Soarer, 2d chief, | his x mark. [L. S.] |
| NAW–WAW–GE–WAW–NOSE, or the Little Current, 2d chief, | his x mark. [L. S.] |
| MAW–CAW–DAY–WAW–QUOT, or the Black Cloud, 2d chief, | his x mark. [L. S.] |
| ME–SHE–NAW–WAY, or the Disciple, 2d chief | his x mark. [L. S.] |
| KEY–ME–WAW–NAW–UM, headman, | his x mark. [L. S.] |
| SHE–GOG, headman, | his x mark. [L. S.] |

*Ontonagon Band.*

| | |
|---|---|
| O–CUN–DE–CUN, or the Buoy, 1st chief, | his x mark. [L. S.] |
| WAW–SAY–GE–ZHICK, or the Clear Sky, 2d chief, | his x mark. [L. S.] |
| KEESH–KE–TAW–WUG, headman, | his x mark. [L. S.] |

*L'Anse Band.*

| | |
|---|---|
| DAVID KING, 1st chief, | his x mark. [L. S.] |
| JOHN SOUTHWIND, headman, | his x mark. [L. S.] |
| PETER MARKSMAN, headman, | his x mark. [L. S.] |
| NA–TAW–ME–GE–ZHICK, or the First Sky, 2d chief, | his x mark. [L. S.] |
| AW–SE–NEECE, headman, | his x mark. [L. S.] |

*Vieux De Sert Band.*

| | |
|---|---|
| MAY–DWAY–AW–SHE, 1st chief, | his x mark. [L. S.] |
| POSH–QUAY–GIN, or the Leather, 2d chief, | his x mark. [L. S.] |

*Grand Portage Band.*

| | |
|---|---|
| SHAW–GAW–NAW–SHEENCE, or the Little Englishman, 1st chief, | his x mark. [L. S.] |
| MAY–MOSH–CAW–WOSH, headman, | his x mark. [L. S.] |
| AW–DE–KONSE, or the Little Reindeer, 2d chief, | his x mark. [L. S.] |
| WAY–WE–GE–WAM, headman, | his x mark. [L. S.] |

*Fond Du Lac Band.*

| | |
|---|---|
| SHING–GOOPE, or the Balsom, 1st chief, | his x mark. [L. S.] |
| MAWN–GO–SIT, or the Loon's Foot, 2d chief, | his x mark. [L. S.] |

MAY–QUAW–ME–WE–GE–ZHICK, headman, his x mark. [L. S.]
KEESH–KAWK, headman, his x mark. [L. S.]
CAW–TAW–WAW–BE–DAY, headman, his x mark. [L. S.]
O–SAW–GEE, headman, his x mark. [L. S.]
KE–CHE–AW–KE–WAIN–ZE, headman, his x mark. [L. S.]
NAW–GAW–NUB, or the Foremost Sitter, 2d chief, his x mark. [L. S.]
AIN–NE–MAW–SUNG, 2d chief, his x mark. [L. S.]
NAW–AW–BUN–WAY, headman, his x mark. [L. S.]
WAIN–GE–MAW–TUB, headman, his x mark. [L. S.]
AW–KE–WAIN–ZEENCE, headman, his x mark. [L. S.]
SHAY–WAY–BE–NAY–SE, headman, his x mark. [L. S.]
PAW–PE–OH, headman, his x mark. [L. S.]

*Lac Court Oreille Band.*

AW–KE–WAIN–ZE, or the Old Man, 1st chief, his x mark. [L. S.]
KEY–NO–ZHANCE,
 or the Little Jack Fish, 1st chief, his x mark. [L. S.]
KEY–CHE–PE–NAY–SE, or the Big Bird, 2d chief, his x mark. [L. S.]
KE–CHE–WAW–BE–SHAY–SHE,
 or the Big Martin, 2d chief, his x mark. [L. S.]
WAW–BE–SHAY–SHEENCE, headman, his x mark. [L. S.]
QUAY–QUAY–CUB, headman, his x mark. [L. S.]
SHAW–WAW–NO–ME–TAY, headman, his x mark. [L. S.]
NAY–NAW–ONG–GAY–BE,
 or the Dressing Bird, 1st chief, his x mark. [L. S.]
O–ZHAW–WAW–SCO–GE–ZHICK,
 or the Blue Sky, 2d chief, his x mark. [L. S.]
I–YAW–BANSE, or the Little Buck, 2d chief, his x mark. [L. S.]
KE–CHE–E–NIN–NE, headman, his x mark. [L. S.]
HAW–DAW–GAW–ME, headman, his x mark. [L. S.]
WAY–ME–TE–GO–SHE, headman, his x mark. [L. S.]
PAY–ME–GE–WUNG, headman, his x mark. [L. S.]

*Lac Du Flambeau Band.*

AW–MO–SE, or the Wasp, 1st chief, his x mark. [L. S.]
KE–NISH–TE–NO, 2d chief, his x mark. [L. S.]
ME–GEE–SEE, or the Eagle, 2d chief, his x mark. [L. S.]
KAY–KAY–CO–GWAW–NAY–AW–SHE,
 headman, his x mark. [L. S.]
O–CHE–CHOG, headman, his x mark. [L. S.]
NAY–SHE–KAY–GWAW–NAY–BE, headman, his x mark. [L. S.]
O–SCAW–BAY–WIS, or the Waiter, 1st chief, his x mark. [L. S.]
QUE–WE–ZANCE, or the White Fish, 2d chief, his x mark. [L. S.]
NE–GIG, or the Otter, 2d chief, his x mark. [L. S.]
 VOL. X. TREAT.—140

NAY–WAW–CHE–GE–GHICK–MAY–BE,
 headman, his x mark. [L. S.]
QUAY–QUAY–KE–CAH, headman, his x mark. [L. S.]

*Bois Forte Band.*

KAY–BAISH–CAW–DAW–WAY,
 or Clear Round the Prairie, 1st chief, his x mark. [L. S.]
WAY–ZAW–WE–GE–ZHICK–WAY–SKING,
 headman, his x mark. [L. S.]
O–SAW–WE–PE–NAY–SHE, headman, his x mark. [L. S.]

*The Mississippi Bands.*

QUE–WE–SAN–SE, or Hole in the Day, head chief, his x mark. [L. S.]
CAW–NAWN–DAW–WAW–WIN–ZO,
 or the Berry Hunter, 1st chief, his x mark. [L. S.]
WAW–BOW–JIEG, or the White Fisher, 2d chief, his x mark. [L. S.]
OT–TAW–WAW, 2d chief, his x mark. [L. S.]
QUE–WE–ZHAN–CIS, or the Bad Boy, 2d chief, his x mark. [L. S.]
BYE–A–JICK, or the Lone Man, 2d chief, his x mark. [L. S.]
I–YAW–SHAW–WAY–GE–ZHICK,
 or the Crossing Sky, 2d chief, his x mark. [L. S.]
MAW–CAW–DAY, or the Bear's Heart, 2d chief, his x mark. [L. S.]
KE–WAY–DE–NO–GO–NAY–BE,
 or the Northern Feather, 2d chief, his x mark. [L. S.]
ME–SQUAW–DACE, headman, his x mark. [L. S.]
NAW–GAW–NE–GAW–BO, headman, his x mark. [L. S.]
WAWM–BE–DE–YEA, headman, his x mark. [L. S.]
WAISH–KEY, headman, his x mark. [L. S.]
CAW–WAY–CAW–ME–GE–SKUNG, headman, his x mark. [L. S.]
MY–YAW–GE–WAY–WE–DUNK,
 or the One who carries the Voice, 2d chief, his x mark. [L. S.]

JOHN F. GODFROY,
GEO. JOHNSTON,
S. A. MARVIN,
LOUIS CODOT,
PAUL H. BEAULIEU,
HENRY BLATCHFORD,
PETER FLOY,
 } *Interpreters.*

Executed in the presence of

 HENRY M. RICE,
 J. W. LYNDE,
 G. D. WILLIAMS,
 B. H. CONNOR,
 E. W. MULDOUGH,
 RICHARD GODFROY,
 D. S. CASH,
 H. H. MCCULLOUGH,
 E. SMITH LEE,
 WM. E. VANTASSEL,
 L. H. WHEELER.